[No. S018831. Dec. 27, 1993.]

FRANK POTTER et al., Plaintiffs and Respondents, v.
FIRESTONE TIRE AND RUBBER COMPANY, Defendant and
Appellant.

966

**COUNSEL**

Kaye, Scholer, Fierman, Hays & Handler, Pierce O'Donnell, Gerard Fox, Jeffrey Miles, McCutchen, Doyle, Brown & Enersen, John W. Fowler, John R. Reese, Patricia L. Walker, Warner & Hogan, Charles G. Warner and Harvey M. Grossman for Defendant and Appellant.

Wiley, Rein & Fielding, Thomas W. Brunner, Laura A. Foggan, Frederick S. Ansell, Stephen D. Goldman, Sullivan, Roche & Johnson, Cameron Kirk, Jr., James L. Kimble, Seyfarth, Shaw, Fairweather & Geraldson, Sue J. Scott, Randal L. Golden, David F. Zoll, Donald D. Evans, Robin S. Conrad, Jan S. Amundson, Sedgwick, Detert, Moran & Arnold, Frederick D. Baker, Pillsbury, Madison & Sutro, Sidney K. Kanazawa, Kevin M. Fong, Latham & Watkins, Ernest J. Getto, Cynthia H. Cwik, Charles F. Weiss, Nielsen, Merksamer, Parrinello, Mueller & Naylor, Steve Merksamer, John E. Mueller, Peter Fullerton, John Montgomery, Daniel J. Popeo, Richard A. Samp, Fred J. Hiestand, Catherine I. Hanson, Alice P. Mead and Christiana Geffen as Amici Curiae on behalf of Defendant and Appellant.

Stemple & Boyajian, Gordon A. Stemple, Richard Amerian, Sharon Munson Swanson and Robert K. Crawford for Plaintiffs and Respondents.

Douglas Devries, Leonard Sachs, Bruce Broillet, Robert Steinberg, Roland Wrinkle, Harvey R. Levine, Ian Herzog, Evan D. Marshall, Rouda, Feder & Tietjen, Ronald H. Rouda, Macon Cowles, Priscilla Budeiri, Arthur Bryant and Anne Bloom as Amici Curiae on behalf of Plaintiffs and Respondents.

Nossaman, Gunther, Knox & Elliott, Kurt W. Melchior, Brobeck, Phleger & Harrison, Tom M. Freeman, Thomas M. Peterson, William R. Irwin, Hill, Wynne, Troop & Meisinger, David W. Steuber, Kirk Pasich, Covington & Burling, Robert N. Sayler and William P. Skinner as Amici Curiae.

**OPINION**

BAXTER, J.—We granted review in this case to consider:

(1) whether emotional distress engendered by a fear of cancer or other serious physical illness or injury following exposure to a carcinogen or other toxic substance is an injury for which damages may be recovered in a negligence action in the absence of physical injury;

(2) whether Firestone Tire and Rubber Company is liable for intentional infliction of emotional distress under *Christensen* v. *Superior Court* (1991) 54 Cal.3d 868 [2 Cal.Rptr.2d 79, 820 P.2d 181];

(3) whether the cost of future medical monitoring to detect the onset of cancer is a recoverable item of damage when, as a result of a defendant's negligence, a plaintiff has an increased risk of future illness but suffers no present physical injury or illness; and

(4) whether any effect should be given to evidence that a plaintiff has negligently ingested other toxic substances or carcinogens.

Our analysis of existing case law and policy considerations relevant to the availability of damages for emotional distress leads us to conclude that, generally, in the absence of a present physical injury or illness, recovery of damages for fear of cancer in a negligence action should be allowed only if the plaintiff pleads and proves that the fear stems from a knowledge, corroborated by reliable medical and scientific opinion, that it is more likely than not that the feared cancer will develop in the future due to the toxic exposure.

We also conclude, however, that an exception to this general rule is warranted if the toxic exposure that has resulted in the fear of cancer is caused by conduct amounting to "oppression, fraud, or malice," as defined in Civil Code section 3294. In such cases, a plaintiff should be allowed to recover without having to show knowledge that it is more likely than not that the feared cancer will occur, so long as the plaintiff's fear is otherwise serious, genuine and reasonable.

We find further that *Christensen* v. *Superior Court, supra,* 54 Cal.3d 868, precludes any liability for intentional infliction of emotional distress in the absence of a determination that Firestone's extreme and outrageous conduct was directed at plaintiffs or undertaken with knowledge of their presence and consumption of the groundwater, and with knowledge of a substantial certainty that they would suffer severe emotional injury upon discovery of the facts.

On the issue of medical monitoring costs, we hold that such costs are a compensable item of damages in a negligence action where the proofs demonstrate, through reliable medical expert testimony, that the need for future monitoring is a reasonably certain consequence of the plaintiff's toxic exposure and that the recommended monitoring is reasonable.

Finally, we conclude that when a defendant in a negligence action demonstrates that a plaintiff's smoking is negligent and that a portion of the plaintiff's fear of cancer is attributable to the smoking, comparative fault principles may be applied to reduce the amount of recovery for emotional distress damages based on such fear.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

This is a toxic exposure case brought by four landowners living adjacent to a landfill. As a result of defendant Firestone's practice of disposing of its toxic wastes at the landfill, the landowners were subjected to prolonged exposure to certain carcinogens. While none of the landowners currently suffers from any cancerous or precancerous condition, each faces an enhanced but unquantified risk of developing cancer in the future due to the exposure.

The following background facts are contained in the trial court's statement of decision following trial.

From 1963 until 1980, Firestone operated a tire manufacturing plant near Salinas. In 1967, Firestone contracted with Salinas Disposal Service and Rural Disposal (hereafter SDS), two refuse collection companies operating the Crazy Horse landfill (hereafter Crazy Horse), for disposal of its industrial waste. Firestone agreed to deposit its waste in dumpsters provided by SDS located at the plant site. SDS agreed to haul the waste to Crazy Horse and deposit it there.

Crazy Horse, a class II sanitary landfill owned by the City of Salinas, covers approximately 125 acres suitable for the disposal of household and commercial solid waste. Unlike dump sites that are classified class I, class II landfills such as Crazy Horse prohibit toxic substances and liquids because of the danger that they will leach into the groundwater and cause contamination.

At the outset of their contractual relationship, SDS informed Firestone that no solvents, cleaning fluids, oils or liquids were permitted at Crazy Horse. Firestone provided assurances that these types of waste would not be sent to the landfill.

Notwithstanding its assurances, Firestone sent large quantities of liquid waste to Crazy Horse, including banbury drippings (a by-product of the tire manufacturing process) containing a combination of semiliquid toxic chemicals. Firestone also sent liquid waste oils, liquid tread end cements, and solvents to the landfill.

In May 1977, Firestone's plant engineer, who was in charge of all environmental matters, sent a memorandum to Firestone's plant managers

and department heads. The memorandum, reflecting official plant policy, explained liquid waste disposal procedures and described the particular waste materials involved and the proper method of handling them.

In order to comply with this policy, Firestone initially made efforts to take the waste materials to a class I dump site. However, Firestone accumulated more waste than had been anticipated and disposing of the waste proved costly. When noncompliance with the policy became widespread, the plant engineer sent another memorandum to plant management complaining about the lack of compliance and pointing out that the policy was required by California law.

During this time, the Salinas plant operated under a production manager who had been sent from Firestone's company headquarters in Akron, Ohio, for the purpose of "turning the plant around" and making it more profitable. This manager became angered over the costs of the waste disposal program and decided to discontinue it. As a consequence, Firestone's hazardous waste materials were once again deposited at Crazy Horse.

Frank and Shirley Potter owned property and lived adjacent to Crazy Horse. Joe and Linda Plescia were their neighbors.

In 1984, the Potters and the Plescias (hereafter plaintiffs) discovered that toxic chemicals had contaminated their domestic water wells. The chemicals included: benzene; toluene; chloroform; 1,1-dichloroethene; methylene chloride; tetrachloroethene; 1,1,1-trichloroethane; trichloroethene; and vinyl chloride. Of these, both benzene and vinyl chloride are known to be human carcinogens. Many of the others are strongly suspected to be carcinogens.

In 1985, plaintiffs filed separate suits against Firestone for damages and declaratory relief. Their complaints against Firestone stated causes of action for, inter alia, negligence, negligent and intentional infliction of emotional distress, and strict liability/ultrahazardous activity. The two cases were tried together in a court trial. After considering all the evidence, the court found that Firestone was negligent; that negligent and intentional infliction of emotional distress were established; and that Firestone's conduct was an ultrahazardous activity that would subject Firestone to strict liability for resulting damages. Judgment was entered in favor of plaintiffs.

In its statement of decision, the trial court concluded that Firestone's waste disposal practices from 1967 until 1974 constituted actionable negligence. In particular, it determined that Firestone's dumping of liquid and semiliquid wastes at Crazy Horse, despite having been told that such dumping was prohibited, fell below the appropriate standard of care. In rejecting

Firestone's argument that it was not negligent because the dangers posed by toxins were not widely known until the mid-1970's, the trial court concluded that: (1) Firestone had been informed by SDS that no solvents, cleaning fluids, oils or liquids were permitted at Crazy Horse; (2) it fell below the standard of care for a large, international corporation with scientific and legal experts in its employ, having been alerted to the impropriety of disposing of these wastes at the landfill, to violate these regulations without at least making reasonable inquiry into the reasons for the restrictions; and (3) if Firestone had made a minimal inquiry, it would have discovered, among other things, the dangers to groundwater from landfill leachates and the potential for contaminating domestic wells.

The trial court also concluded that Firestone was liable for intentional infliction of emotional distress. The court found that the 1977 memorandum detailing how liquid wastes should be disposed reflected Firestone's increased knowledge at that time about the dangers of toxic waste. Given the evidence regarding this memorandum and the fact that the memorandum represented Firestone's official waste disposal policy, the court concluded that Firestone's decision to dump its waste at Crazy Horse in violation of that policy in order to reduce costs was extreme and outrageous conduct.

Finally, the trial court determined that the dumping of large amounts of toxic wastes in a class II landfill constituted an ultrahazardous activity.

In finding liability, the trial court determined that the toxic chemicals in plaintiffs' drinking water were the same chemicals or "daughter" chemicals as those used at the Firestone plant. Firestone was the heaviest single contributor of waste at Crazy Horse, and the only contributor with the identical "suite" of chemicals to those found in the water. The court also noted the expert testimony established that the chemicals that migrated off the Firestone plant site so closely resembled those in the water that the comparison constituted a virtual "fingerprint" identifying Firestone as the source of the contaminants.

The court did not attribute any item of damage to any one specific theory of recovery. After noting that plaintiffs' likelihood of harm due to their toxic exposure was the subject of conflicting medical opinions at trial, the court concluded there was convincing evidence that the prolonged nature of the exposure had "enhanced" plaintiffs' risk of developing cancer and other maladies, and that this enhanced susceptibility was a "presently existing physical condition." The court observed that although there was no way to quantify this risk, the risk was nevertheless very real. In its view, reliable scientific opinion and common sense both supported the conclusion that a

prolonged period of exposure substantially increased the susceptibility to disease.

The court also stated that although plaintiffs testified to a constellation of physical symptoms which they attributed to the toxic chemicals, it was "not possible to demonstrate with sufficient certainty a causal connection between these symptoms and the well water contamination. Nevertheless, plaintiffs will always fear, and reasonably so, that physical impairments they experience are the result of the well water and are the precursers [sic] of life threatening disease. Their fears are not merely subjective but are corroborated by substantial medical and scientific opinion." Based on these findings, plaintiffs were awarded damages totalling $800,000 for their lifelong fear of cancer and resultant emotional distress.

The court further concluded that since plaintiffs now live with an increased vulnerability to serious disease, it was axiomatic that they should receive periodic medical monitoring to detect the onset of disease at the earliest possible time and that early diagnosis was unquestionably important to increase the chances of effective treatment. Accordingly, the court awarded damages totalling $142,975 as the present value of the costs of such monitoring, based on plaintiffs' life expectancies.

The court also awarded plaintiffs damages totalling $269,500 for psychiatric illness and the cost of treating such illness,[1] as well as damages totalling $108,100 for the general disruption of their lives and the invasion of their privacy.[2] Finally, the court awarded punitive damages totalling $2.6 million based on Firestone's conscious disregard for the rights and safety of others in dumping its toxic wastes at the landfill after 1977.

Firestone appealed, arguing that the damage awards were not supported by any of the legal theories relied on by the trial court and that the evidence was insufficient to support the trial court's findings. It claimed that the award for "fear of cancer" in the absence of physical injury was an unwarranted extension of liability for negligent infliction of emotional distress, that if such fear is compensable it should not be so where the plaintiff cannot establish that he or she has a "probability" of developing cancer, and that the amount of damages awarded each plaintiff was not based on proof of individualized injury. The award for "psychiatric injury" was challenged on the ground that the injury was indistinguishable from fear of cancer and was not supported by the evidence.

---

[1]The court determined that these damages were separate and distinct from plaintiffs' basic fear of developing cancer or other serious physical illnesses in the future.

[2]This award reflected the necessity for plaintiffs to shower elsewhere, use bottled water, and submit to intrusions by numerous agencies involved in testing water and soil.

Firestone asserted a number of other errors in its appeal. It argued that intentional infliction of emotional distress had not been established because its conduct was not shown to be "extreme and outrageous," and the evidence did not support the finding that it was undertaken with the intent to cause, or reckless disregard of the probability of causing, such injury. Firestone further contended that the elements of a cause of action for strict liability for ultrahazardous activity had not been established, and that, in any event, if damages for fear of cancer could not be awarded on a negligence theory, it followed that they should not be awarded on a strict liability for ultrahazardous activity theory. Additionally, it challenged the damages awarded for medical monitoring on the ground that the amounts were not supported by the evidence and that the cost of medical examinations was not an item of damage that should be imposed on it.

Finally, Firestone argued that the trial court had erred in admitting and considering irrelevant evidence, that plaintiffs' comparative negligence had not been considered, that compensation for "disruption" of plaintiffs' lives was improper in an action in which property damages are not recoverable,[3] and that the court erred in assessing punitive damages.

The Court of Appeal reversed the awards for medical monitoring costs, as well as a postjudgment order directing Firestone to pay costs and interest, but otherwise affirmed the judgment. The court held that, given the circumstances in which plaintiffs ingested the carcinogens, it was unnecessary for them to establish a present physical injury in order to recover for their fear of cancer. It further held it was unnecessary for plaintiffs to prove they were likely to develop cancer, noting their fear was certain, definite and real, and not contingent on whether they in fact develop the disease. Plaintiffs had proven the elements of a negligence cause of action and had demonstrated, under an objective standard, that their emotional distress was serious. The court also held Firestone was properly found liable for intentional infliction of emotional distress. However, the court reversed the awards for medical monitoring costs because plaintiffs failed to establish that cancer was reasonably certain to occur, and did not address the challenge to the amount of those awards. The court affirmed the amount of the compensatory damages award and found the punitive damage award proper.

Because that court concluded that the negligence and intentional infliction of emotional distress causes of action supported the damage awards, it did not reach Firestone's claim that the trial court erred in finding that its conduct constituted an ultrahazardous activity for which it was strictly liable.

[3]The trial court ruled that damages for injury to plaintiffs' property were within the scope of a separate inverse condemnation action.

## II.

### DISCUSSION

Before addressing the parties' claims, it would be useful to identify what is not at issue in this case and to reiterate what is. Firestone does not currently challenge, nor do we undertake to address, the correctness of the award for the general disruption to plaintiffs' lives. We also do not consider Firestone's perfunctory claim that the psychiatric illness component of the emotional distress award is erroneous.[4] (See *People* v. *Ashmus* (1991) 54 Cal.3d 932, 985, fn. 15 [2 Cal.Rptr.2d 112, 820 P.2d 214].) Consequently, the only damages at issue here are the fear of cancer component of the emotional distress award, the award for medical monitoring costs and the award for punitive damages. We also consider whether Firestone may be held liable for intentional infliction of emotional distress under *Christensen* v. *Superior Court, supra,* 54 Cal.3d 868, and whether comparative fault principles regarding plaintiffs' smoking are properly invoked in this case.

### A. *Negligence: Fear of Cancer*

"Fear of cancer" is a term generally used to describe a present anxiety over developing cancer in the future.[5] Claims for fear of cancer have been increasingly asserted in toxic tort cases as more and more substances have been linked with cancer. Typically, a person's likelihood of developing cancer as a result of a toxic exposure is difficult to predict because many forms of cancer are characterized by long latency periods (anywhere from 20 to 30 years), and presentation is dependent upon the interrelation of myriad factors.

The availability of damages for fear of cancer as a result of exposure to carcinogens or other toxins in negligence actions is a relatively novel issue

---

[4]Essentially, Firestone asserts that if we reverse the $800,000 fear of cancer award, we should reverse the award of $269,500 for psychiatric illness for the same reasons. The trial court, however, deemed such damage separate and distinct from plaintiffs' fear of cancer. Firestone fails to explain the nature of the psychiatric illness award and neglects to provide any argument as to why the two awards should be treated the same.

[5]Some commentators and courts have referred to claims for "fear of cancer" as "cancerphobia" claims. (See *Sterling* v. *Velsicol Chemical Corp.* (6th Cir. 1988) 855 F.2d 1188, 1206, fn. 24 [hereafter *Sterling*]; Gale & Goyer, *Recovery for Cancerphobia and Increased Risk of Cancer* (1985) 15 Cumb.L.Rev. 723, 724-725.) Strictly speaking, however, there is a distinction between fear of cancer and cancerphobia. Cancerphobia, as a "phobic reaction," is a mental illness that is the recurrent experience of dread of a cancer in the absence of objective danger. In contrast, the fear of cancer is a claimed anxiety caused by the fear of developing cancer and is not a mental illness. (See *ibid.*) This opinion is concerned only with fear of cancer as a form of emotional distress and not with cancerphobia. Furthermore, while plaintiffs identified fear of cancer as the principal basis for the emotional distress claim at issue, our discussion is equally relevant to emotional distress engendered by fear that other types of serious physical illness or injury may result from toxic exposure.

for California courts. Other jurisdictions, however, have considered such claims and the appropriate limits on recovery. Factors deemed important to the compensability of such fear have included proof of a discernible physical injury (e.g., *Wisniewski* v. *Johns-Manville Corp.* (3d Cir. 1985) 759 F.2d 271, 274; *Eagle-Picher Industries, Inc.* v. *Cox* (Fla.Dist.Ct.App. 1985) 481 So.2d 517, 528-529; *Payton* v. *Abbott Labs* (1982) 386 Mass. 450 [437 N.E.2d 171, 180-181] [hereafter *Payton*]), proof of a physical impact or physical invasion (e.g., *Herber* v. *Johns-Manville Corp.* (3d Cir. 1986) 785 F.2d 79, 85; *Wilson* v. *Key Tronic Corp.* (1985) 40 Wn.App. 802 [701 P.2d 518, 524] [hereafter *Wilson*]; *Wetherill* v. *University of Chicago* (N.D.Ill. 1983) 565 F.Supp. 1553, 1560 [hereafter *Wetherill*]), and objective proof of mental distress (e.g., *Stites* v. *Sundstrand Heat Transfer, Inc.* (W.D.Mich 1987) 660 F.Supp. 1516, 1526, 1527; *Daley* v. *LaCroix* (1970) 384 Mich. 4 [179 N.W.2d 390, 395]).

We must now consider whether, pursuant to California precedent, emotional distress engendered by the fear of developing cancer in the future as a result of a toxic exposure is a recoverable item of damages in a negligence action.

### 1. *Parasitic Recovery: Immune System Impairment and/or Cellular Damage as Physical Injury*

Because it initially appeared plaintiffs might have suffered damage to their immune systems, we solicited the views of the parties on whether such damage constitutes physical injury. ■ We did so because it is settled in California that in ordinary negligence actions for physical injury, recovery for emotional distress caused by that injury is available as an item of parasitic damages. (*Crisci* v. *Security Insurance Co.* (1967) 66 Cal.2d 425, 433 [58 Cal.Rptr. 13, 426 P.2d 173]; *Merenda* v. *Superior Court* (1992) 3 Cal.App.4th 1, 8-9 [4 Cal.Rptr.2d 87].) Where a plaintiff can demonstrate a physical injury caused by the defendant's negligence, anxiety specifically due to a reasonable fear of a future harm attributable to the injury may also constitute a proper element of damages. (E.g., *Jones* v. *United Railroads of San Francisco* (1921) 54 Cal.App. 744 [202 P. 919] [affirming damages for emotional distress endured up to time of trial where plaintiff reasonably feared permanent disability in the future as direct and proximate result from physical injury received in accident].)

Although the availability of parasitic damages for emotional distress engendered by a fear of developing cancer in the future appears to be an

issue of first impression in California,[6] other jurisdictions have concluded that such damages are recoverable when they are derivative of a claim for serious physical injuries. For example, the court in *Ferrara* v. *Galluchio* (1958) 5 N.Y.2d 16, 21-22 [176 N.Y.S.2d 996, 1000, 152 N.E.2d 249, 71 A.L.R.2d 331] upheld an award of emotional distress damages based on the plaintiff's fear of cancer where she had been negligently burned in X-ray treatments and later advised by a dermatologist to have her tissue examined every six months as cancer might develop. (Accord, *Dempsey* v. *Hartley* (E.D.Pa. 1951) 94 F.Supp. 918, 920-921 [fear of breast cancer due to traumatic breast injury]; *Alley* v. *Charlotte Pipe & Foundry Co.* (1912) 159 N.C. 327 [74 S.E. 885, 886] [fear stemming from sarcoma liable to ensue from burn wound].) In these cases, the existence of a present physical injury, rather than the degree of probability that the disease may actually develop, is determinative.

No California cases address whether impairment of the immune system response and cellular damage constitute "physical injury" sufficient to allow recovery for parasitic emotional distress damages. Courts in other jurisdictions that have considered this issue recently have come to differing conclusions.

Plaintiffs, citing several such cases, contend that immune system impairment and cellular damage is a physical injury for which parasitic damages for emotional distress are available. (E.g., *Werlein* v. *United States* (D.Minn. 1990) 746 F.Supp. 887, 901, 906 [chromosomal breakage and damage to cardiovascular and immunal systems sufficient to satisfy present physical injury requirement for recovery of emotional distress damages where medical experts were prepared to testify as to such injury and authenticity of plaintiffs' symptoms]; *Anderson* v. *W.R. Grace & Co.* (D.Mass. 1986) 628 F.Supp. 1219, 1226-1227 [subcellular harm or harm affecting body's ability to fight disease and causing harm to body's organ systems sufficient to support claim for emotional distress]; cf. *Barth* v. *Firestone Tire and Rubber Co.* (N.D.Cal. 1987) 661 F.Supp. 193, 196 [hereafter *Barth*] [determining that, under California law, injury to immune system is form of

---

[6]Although fear of cancer damages were not specifically at issue, one California court affirmed an award of personal injury damages in an X-ray burn case where the jury was permitted to consider medical testimony that the plaintiff was in danger of developing a cancer upon the scars of her X-ray burns. (*Coover* v. *Painless Parker, Dentist* (1930) 105 Cal.App. 110 [286 P. 1048].) The court noted that the jury members were instructed to consider as elements of damage only such physical injury as they may have found the plaintiff was certain to suffer in the near future. While the plaintiff did not currently have a cancer, the expert testimony established that in many instances a carcinoma would develop upon the scars of X-ray burns and that such sequela was very, very likely. Given this testimony, the court believed that the plaintiff's predisposition toward cancer warranted consideration as an element of damage. (*Id.*, at pp. 114-115.)

actionable physical injury];[7] *Brafford* v. *Susquehanna Corp.* (D.Colo. 1984) 586 F.Supp. 14 [although availability of emotional distress damages not specifically discussed, claim for physical injury allowed to proceed where evidence showed that chromosomal damage caused by radiation operated to deprive plaintiffs of a certain degree of immunity].)

Conversely, Firestone contends that mere subcellular changes that are unaccompanied by clinically verifiable symptoms of illness or disease do not constitute a physical injury sufficient to support a claim for parasitic emotional distress damages. To support this contention, Firestone relies on a case in which workers' claims for fear of cancer from asbestos exposure were denied because they had failed to show that their fear was based on knowledge that their lungs were functionally impaired. (*In re Hawaii Federal Asbestos Cases* (D.Hawaii 1990) 734 F.Supp. 1563, 1569-1570.) There it was held that a physical injury was not established by the mere presence of asbestos fibers in the lungs or by evidence of physiological changes in the lungs such as pleural thickening and pleural plaques. (*Id.*, at p. 1567.) Firestone also relies on cases holding that in the absence of some verifiable impairment, asbestos-related subcellular changes do not give rise to valid claims for physical injury. (E.g., *Schweitzer* v. *Consolidated Rail Corp.* (3d Cir. 1985) 758 F.2d 936, 942 [although availability of emotional distress damages not discussed, subclinical injury resulting from exposure to asbestos held insufficient to constitute requisite actual loss or damage under Federal Employers' Liability Act]; *Owens-Illinois* v. *Armstrong* (1991) 87 Md.App. 699 [591 A.2d 544, 560-561] [pleural plaques and pleural scarring do not cause functional impairment or harm and therefore are not compensable].)

It is not clear from the record in this case, however, that these plaintiffs' emotional distress is parasitic to this type of supposed injury. The statement of decision by the trial court does not include an express finding that plaintiffs' exposure to the contaminated well water resulted in physical injury, cellular damage or immune system impairment. The court made no

---

[7]In *Barth*, an employee brought a class action on behalf of himself and other employees against Firestone, the same defendant here, alleging claims including fraudulent concealment, battery and emotional distress arising out of alleged exposure to toxic substances. Although the employee did not allege any symptom of injury that could be clinically diagnosed, he did allege (1) an injury to his immune system that rendered him "more susceptible to developing various forms of cancer"; and (2) an injury based on an "increased risk" of contracting cancer. (661 F.Supp. at p. 196.) Accepting these allegations to be true for purposes of Firestone's motion to dismiss, the district court ruled, without citation to authority, that the alleged injury to the immune system was sufficient to state an actionable present injury. (*Ibid.*) Then, accepting as true plaintiff's allegation that he suffered from fear of contracting serious and/or lethal diseases as a result of the toxic exposure, the court ruled that such emotional injuries sufficiently stated a present injury to sustain a claim for relief. (*Ibid.*)

mention of plaintiffs' immune system response, cellular systems or cells, and made no specific determination of damage or impairment thereto. While the trial court concluded that plaintiffs do have an enhanced "susceptibility" or "risk" for developing cancer and other maladies, it characterized this as a "presently existing physical condition," not as a physical injury. We conclude, therefore, that we lack an appropriate factual record for resolving whether impairment to the immune response system or cellular damage constitutes a physical injury for which parasitic damages for emotional distress ought to be available.[8]

### 2. *Nonparasitic Fear of Cancer Recovery*

We next determine whether the absence of a present physical injury precludes recovery for emotional distress engendered by fear of cancer. Firestone argues that California should not recognize a duty to avoid negligently causing emotional distress to another, but, if such a duty is recognized, recovery should be permitted in the absence of physical injury only on proof that the plaintiff's emotional distress or fear is caused by knowledge that future physical injury or illness is more likely than not to occur as a direct result of the defendant's conduct. Amici curiae, many of whom represent organizations of manufacturers and their insurers, would preclude all recovery for emotional distress in the absence of physical injury.

### a. *Independent Duty*

Firestone first asks the court to expressly adopt the rule recently applied by the Supreme Court of Texas in *Boyles* v. *Kerr* (Tex. 1993) 855 S.W.2d 593. There the court held that there is no duty to avoid negligently causing emotional distress to another, and that damages for emotional distress are recoverable only if the defendant has breached some other duty to the plaintiff. (*Id.*, at p. 594.)

■ That is already the law in California. Indeed, the Texas court relied on recent decisions of this court in which we recognized that there is no independent tort of negligent infliction of emotional distress. (*Boyles* v. *Kerr*, *supra*, 855 S.W.2d at p. 599.) The tort is negligence, a cause of action in which a duty to the plaintiff is an essential element. (See *Burgess* v. *Superior Court* (1992) 2 Cal.4th 1064, 1073 [9 Cal.Rptr.2d 615, 831 P.2d 1197] [hereafter *Burgess*]; *Christensen* v. *Superior Court*, *supra*, 54 Cal.3d 868,

---

[8]Although the trial court did find that plaintiffs currently face an unquantified enhanced risk of developing disease, the Court of Appeal held that an increased risk of disease is not a present physical injury and is not compensable unless there is evidence that it is probable that the disease will occur. (See fn. 15, *post*, and cases cited therein.) This issue is not before us since plaintiffs have not challenged the Court of Appeal's ruling in this regard.

890-891; *Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc.* (1989) 48 Cal.3d 583, 590 [257 Cal.Rptr. 98, 770 P.2d 278] [hereafter *Marlene F.*]; see also *Anderson* v. *Northrop Corp.* (1988) 203 Cal.App.3d 772, 776 [250 Cal.Rptr. 189].) That duty may be imposed by law, be assumed by the defendant, or exist by virtue of a special relationship. (*Marlene F., supra,* 48 Cal.3d at p. 590.)

The lesson of these decisions is: unless the defendant has assumed a duty to plaintiff in which the emotional condition of the plaintiff is an object, recovery is available only if the emotional distress arises out of the defendant's breach of some other legal duty and the emotional distress is proximately caused by that breach of duty. Even then, with rare exceptions, a breach of the duty must threaten physical injury, not simply damage to property or financial interests. (See *Cooper* v. *Superior Court* (1984) 153 Cal.App.3d 1008, 1012-1013 [200 Cal.Rptr. 746]; *Quezada* v. *Hart* (1977) 67 Cal.App.3d 754, 761-763 [136 Cal.Rptr. 815]; cf. *Holliday* v. *Jones* (1989) 215 Cal.App.3d 102, 117, 119 [264 Cal.Rptr. 448].)

 Those limits on recovery for emotional distress caused by the negligent conduct of another do not aid Firestone here, however. Firestone did violate a duty imposed on it by law and regulation to dispose of toxic waste only in a class I landfill and to avoid contamination of underground water.[9] The violation led directly to plaintiffs' ingestion of various known and suspected carcinogens, and thus to their fear of suffering the very harm which the Legislature sought by statute to avoid. Their fear of cancer was proximately caused by Firestone's unlawful conduct which threatened serious physical injury.

This is not a case in which a negligence cause of action is predicated only on a claim that the defendant breached a duty to avoid causing emotional distress.

### b. *Absence of Physical Injury*

Amici curiae argue that no recovery for emotional distress arising from fear of cancer should be allowed in any case unless the plaintiff can establish a present physical injury such as a clinically verifiable cancerous or precancerous condition. Amici curiae advance several legal and policy arguments to support this position. None is persuasive.

---

[9]Specifically, Water Code section 13350, subdivision (a), prohibits deposit of waste where it is discharged into the waters of the state in violation of any waste discharge requirement, order, or prohibition of a regional water quality control board. "Waters of the state" include underground water. (Wat. Code, § 13050.) The substances sent to Crazy Horse by Firestone were prohibited under the classification established by the Department of Water Resources in 1966. Among the purposes for the classification was minimizing migration of leachates from Crazy Horse toward the groundwater basin and degrading nearby domestic wells.

Amici curiae first assert that, under California case law, the existence of a physical injury is a predicate to recovering damages for emotional distress in a negligence action unless the action involves "bystander" recovery (e.g., *Thing* v. *La Chusa* (1989) 48 Cal.3d 644 [257 Cal.Rptr. 865, 771 P.2d 814] [hereafter *Thing*]), or there is a "preexisting relationship" between the plaintiff and defendant (e.g., *Marlene F.*, *supra*, 48 Cal.3d 583) which creates a duty to the plaintiff, neither of which is implicated here. This assertion is plainly without merit.

 Significantly, we recently reaffirmed the principle that, in California, "damages for negligently inflicted emotional distress may be recovered in the absence of physical injury or impact . . . ." (*Burgess*, *supra*, 2 Cal.4th at p. 1074.) We held that "physical injury is not a prerequisite for recovering damages for *serious* emotional distress," especially where "there exists a 'guarantee of genuineness in the circumstances of the case.' [Citation.]" (*Id.*, at p. 1079.)

Contrary to amici curiae's assertions, this principle has never been restricted to cases involving bystanders or preexisting relationships. Notably, amici curiae cite no authority even suggesting such a limitation.[10] Nor is there any question but that Firestone had a duty to any person who might foreseeably come in contact with its hazardous waste to use care in the disposal of that material, care which includes compliance with all government regulations governing the location and manner of disposal. In this court Firestone has abandoned any claim that it was not negligent or that plaintiffs were not foreseeable victims of its negligence.[11]

Amici curiae next contend that substantial policy reasons nevertheless support a physical injury requirement for recovery of fear of cancer damages

---

[10]Indeed, precedent in the law of nuisance and trespass establishes quite clearly that emotional distress without physical injury is compensable. (See *Acadia, California, Ltd.* v. *Herbert* (1960) 54 Cal.2d 328, 337 [5 Cal.Rptr. 686, 353 P.2d 294]; *Kornoff* v. *Kingsburg Cotton Oil Co.* (1955) 45 Cal.2d 265, 272 [288 P.2d 507]; *Herzog* v. *Grosso* (1953) 41 Cal.2d 219, 225 [259 P.2d 429]; *Armitage* v. *Decker* (1990) 218 Cal.App.3d 887, 905 [267 Cal.Rptr. 399]; *Smith* v. *County of Los Angeles* (1989) 214 Cal.App.3d 266, 288 [262 Cal.Rptr. 754].)

[11]We note that one California court, in the context of products liability, denied recovery for fear of future injury to a plaintiff who had received an artificial heart valve implant that was operational but was discovered to have a high statistical rate of failure. (*Khan* v. *Shiley Inc.* (1990) 217 Cal.App.3d 848 [266 Cal.Rptr. 106], review den.) The court reasoned that where a plaintiff alleges that a product is defective, proof of an actual product malfunction is essential to establish liability for an injury caused by the defect. (*Id.*, at p. 855.) Since the plaintiff's heart valve had not malfunctioned, the court determined that the plaintiff could not establish that the defendants breached any duty owed and that therefore a legally cognizable injury under a products liability theory had not yet occurred. (*Id.*, at p. 856.) This case is distinguishable from *Khan*, because here Firestone is not challenging the finding that it was liable for negligence, and the issue with which we are concerned is the compensability of a certain type of emotional distress injury.

where no preexisting relationship exists. They suggest that allowing recovery in the absence of a physical injury would create limitless liability and would result in a flood of litigation which thereby would impose onerous burdens on courts, corporations, insurers and society in general. Allowing such recovery would promote fraud and artful pleading, and would also encourage plaintiffs to seek damages based on a subjective fear of cancer. In amici curiae's view, a physical injury requirement is thus essential to provide meaningful limits on the class of potential plaintiffs and clear guidelines for resolving disputes over liability without the necessity for trial.

This argument overlooks the reasons for our decision to discard the requirement of physical injury. As we observed more than a decade ago, "[t]he primary justification for the requirement of physical injury appears to be that it serves as a screening device to minimize a presumed risk of feigned injuries and false claims. [Citations.]" (*Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916, 925-926 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518] [hereafter *Molien*], disapproved on other grounds, *Burgess, supra*, 2 Cal.4th at p. 1074.) Such harm was "believed to be susceptible of objective ascertainment and hence to corroborate the authenticity of the claim." (*Molien, supra*, 27 Cal.3d at p. 926.)

In *Molien, supra*, 27 Cal.3d 916, we perceived two significant difficulties with the physical injury requirement. First, "the classification is both over-inclusive and underinclusive when viewed in the light of its purported purpose of screening false claims." (27 Cal.3d at p. 928.) It is overinclusive in that it permits recovery whenever the suffering accompanies or results in physical injury, no matter how trivial (*ibid.*), yet underinclusive in that it mechanically denies court access to potentially valid claims that could be proved if the plaintiffs were permitted to go to trial (*id.*, at p. 929).

Second, we observed that the physical injury requirement "encourages extravagant pleading and distorted testimony." (*Molien, supra*, 27 Cal.3d at p. 929.) We concluded that the retention of the requirement ought to be reconsidered because of the tendency of victims to exaggerate sick headaches, nausea, insomnia and other symptoms in order to make out a technical basis of bodily injury upon which to predicate a parasitic recovery for the more grievous disturbance, consisting of the mental and emotional distress endured. (*Ibid.*)

Therefore, rather than adhere to what we perceived as an artificial and often arbitrary means of guarding against fraudulent claims, we acknowledged that "[t]he essential question is one of proof[.]" (*Molien, supra*, 27 Cal.3d at pp. 929-930.) ■ Thus, " '[i]n cases other than where proof of

mental distress is of a medically significant nature, [citations] the general standard of proof required to support a claim of mental distress is some guarantee of genuineness in the circumstances of the case. [Citation.]' " (*Id.*, at p. 930, citing *Rodrigues* v. *State* (1970) 52 Hawaii 156, 173 [472 P.2d 509, 520] [hereafter *Rodrigues*].)

Our reasons for discarding the physical injury requirement in *Molien, supra*, 27 Cal.3d 916, remain valid today and are equally applicable in a toxic exposure case. That is, the physical injury requirement is a hopelessly imprecise screening device—it would allow recovery for fear of cancer whenever such distress accompanies or results in any physical injury, no matter how trivial, yet would disallow recovery in all cases where the fear is both serious and genuine but no physical injury has yet manifested itself. While we agree with amici curiae that meaningful limits on the class of potential plaintiffs and clear guidelines for resolving disputes in advance of trial are necessary, imposing a physical injury requirement represents an inherently flawed and inferior means of attempting to achieve these goals.

### c. *Likelihood of Cancer in the Future*

We next consider whether recovery of damages for emotional distress caused by fear of cancer should depend upon a showing that the plaintiff's fears stem from a knowledge that there is a probable likelihood of developing cancer in the future due to the toxic exposure. This is a matter of hot debate among the parties and amici curiae. Firestone and numerous amici curiae argue that because fear of cancer claims are linked to a future harm which may or may not materialize, such claims raise concerns about speculation and uncertainty and therefore warrant a requirement that the plaintiff show the feared cancer is more likely than not to occur. Plaintiffs and other amici curiae respond that such a requirement is inappropriate in the context of a mental distress claim, and that there are viable methods, apart from requiring quantification of the cancer risk, to screen claims and determine the reasonableness and genuineness of a plaintiff's fears.

Plaintiffs favor the approach adopted by the Court of Appeal, which requires the following showing. The toxic exposure plaintiff must first prove the elements of a negligence cause of action. The plaintiff must then establish that his or her fear of cancer is serious, and that the seriousness meets an objective standard (i.e., the distress must be reasonable under the circumstances). Although a plaintiff is not required to establish that the cancer is likely to occur, the finder of fact should consider evidence regarding the likelihood that cancer will occur (i.e., evidence that the disease is only a remote possibility could lead a trier of fact to conclude that a

plaintiff's fears were unreasonable). Finally, the finder of fact should test the genuineness of the plaintiff's fear under the factors discussed in *Molien, supra,* 27 Cal.3d 916, including expert testimony, a juror's own experience, and the particular circumstances of the case.

In affirming the fear of cancer award, the Court of Appeal remarked that "the fact that [plaintiffs'] water supply was contaminated by carcinogens is, *by itself,* surely a circumstance which is likely to cause emotional distress in most reasonable persons." (Italics added.) In addition, although the Court of Appeal purported to call for a showing of the actual likelihood that the feared cancer will occur, the court indicated that the absence of such evidence is immaterial where, as here, the trier of fact finds a significantly increased risk of cancer.

 We decline to adopt the Court of Appeal's approach. Although the court properly recognized that a toxic exposure plaintiff is required to establish the reasonableness of his or her fear of cancer,[12] it erred in concluding that reasonableness is established by the mere fact of an exposure to, or a significant increase in, the risk of cancer.

A carcinogenic or other toxic ingestion or exposure, without more, does not provide a basis for fearing future physical injury or illness which the law is prepared to recognize as reasonable. The fact that one is aware that he or she has ingested or been otherwise exposed to a carcinogen or other toxin, without any regard to the nature, magnitude and proportion of the exposure or its likely consequences, provides no meaningful basis upon which to evaluate the reasonableness of one's fear. For example, nearly everybody is exposed to carcinogens which appear naturally in all types of foods. Yet ordinary consumption of such foods is not substantially likely to result in cancer. (See Ames & Gold, *Too Many Rodent Carcinogens: Mitogenesis Increases Mutagenesis* (1990) 249 Science 970, 971, fn. 10 [observing that apples, celery, coffee, carrots, cauliflower, grapes, honey, orange juice, potatoes and many other common foods naturally produce carcinogenic pesticides that have been found to induce tumors when administered to rodents in large doses].) Nor is the knowledge of such consumption likely to result in a reasonable fear of cancer.

Moreover, permitting recovery for fear of cancer damages based solely upon a plaintiff's knowledge that his or her risk of cancer has been significantly increased by a toxic exposure, without requiring any further showing

---

[12]A plaintiff may only recover for emotional distress that is serious. (*Molien, supra,* 27 Cal.3d at pp. 929-930.) Serious emotional distress is such that " 'a reasonable [person], normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case.' " (*Id.,* at p. 928, quoting *Rodrigues, supra,* 52 Hawaii 156, 173 [472 P.2d 509, 520]; see also *Thing, supra,* 48 Cal.3d at p. 668 & fn. 12.) Thus, in determining whether emotional distress is serious, an objective standard is utilized.

of the actual likelihood of the feared cancer due to the exposure, provides no protection against unreasonable claims based upon wholly speculative fears. For example, a plaintiff's risk of contracting cancer might be significantly increased by 100 or more percent due to a particular toxic exposure, yet the actual risk of the feared cancer might itself be insignificant and no more than a mere possibility. As even plaintiffs appear to concede, evidence of knowledge that cancer is only a remote possibility could lead a trier of fact to conclude that a claimed fear is objectively unreasonable. This concession only proves the point—the way to avoid damage awards for unreasonable fear, i.e., in those cases where the feared cancer is at best only remotely possible, is to require a showing of the actual likelihood of the feared cancer to establish its significance.

Accordingly, we reject the Court of Appeal's approach because it attaches undue significance to the mere ingestion of a carcinogen, and because it focuses on the increased risk of cancer in isolation.

We turn now to Firestone's argument that fear of cancer should be compensable only where the fear is based upon knowledge that cancer is probable, i.e., that it is more likely than not that cancer will develop. In evaluating this argument, we first consider whether it is reasonable for a person to genuinely and seriously fear a disease that is not probable, and if so, whether the emotional distress engendered by such fear warrants recognition as a compensable harm.

We cannot say that it would never be reasonable for a person who has ingested toxic substances to harbor a genuine and serious fear of cancer where reliable medical or scientific opinion indicates that such ingestion has significantly increased his or her risk of cancer, but not to a probable likelihood. Indeed, we would be very hard pressed to find that, as a matter of law, a plaintiff faced with a 20 percent or 30 percent chance of developing cancer cannot genuinely, seriously and reasonably fear the prospect of cancer. Nonetheless, we conclude, for the public policy reasons identified below, that emotional distress caused by the fear of a cancer that is not probable should generally not be compensable in a negligence action.

As a starting point in our analysis, we recognize the indisputable fact that all of us are exposed to carcinogens every day. As one commentator has observed, "[i]t is difficult to go a week without news of toxic exposure. Virtually everyone in society is conscious of the fact that the air they breathe, water, food and drugs they ingest, land on which they live, or products to which they are exposed are potential health hazards. Although few are exposed to all, few also can escape exposure to any." (Dworkin,

*Fear Of Disease And Delayed Manifestation Injuries: A Solution Or A Pandora's Box?* (1984) 53 Fordham L. Rev. 527, 576, fns. omitted.)

Thus, all of us are potential fear of cancer plaintiffs, provided we are sufficiently aware of and worried about the possibility of developing cancer from exposure to or ingestion of a carcinogenic substance. The enormity of the class of potential plaintiffs cannot be overstated; indeed, a single class action may easily involve hundreds, if not thousands, of fear of cancer claims. (See Willmore, *In Fear of Cancerphobia* (Sept. 28, 1988) 3 Toxics L. Rptr. (Bur.Nat. Affairs) 559, 563 [hereafter Willmore].)

With this consideration in mind, we believe the tremendous societal cost of otherwise allowing emotional distress compensation to a potentially unrestricted plaintiff class demonstrates the necessity of imposing some limit on the class. (See *Borer* v. *American Airlines, Inc.* (1977) 19 Cal.3d 441, 447 [138 Cal.Rptr. 302, 563 P.2d 858] [hereafter *Borer*] [refusing to recognize a child's right to recover for the loss of a parent's consortium]; see also *Thing, supra,* 48 Cal.3d at pp. 664-665 [limiting bystander recovery of damages for negligent infliction of emotional distress].) Proliferation of fear of cancer claims in California in the absence of meaningful restrictions might compromise the availability and affordability of liability insurance for toxic liability risks. (See Willmore, *supra,* 3 Toxics L. Rptr. at p. 563.) "Should [fear of cancer] liability continue to grow, and thereby lead to a substantial increase in toxic tort litigation, such liability insurance will become even more scarce and prohibitively expensive." (*Ibid.*) In the end, the burden of payment of awards for fear of cancer in the absence of a more likely than not restriction will inevitably be borne by the public generally in substantially increased insurance premiums or, alternatively, in the enhanced danger that accrues from the greater number of residents and businesses that may choose to go without any insurance. (See *Borer, supra,* 19 Cal.3d at p. 447.)

A second policy concern that weighs in favor of a more likely than not threshold is the unduly detrimental impact that unrestricted fear liability would have in the health care field. As amicus curiae California Medical Association points out, access to prescription drugs is likely to be impeded by allowing recovery of fear of cancer damages in negligence cases without the imposition of a heightened threshold. To wit, thousands of drugs having no known harmful effects are currently being prescribed and utilized. New data about potentially harmful effects may not develop for years. If and when negative data are discovered and made public, however, one can expect numerous lawsuits to be filed by patients who currently have no physical injury or illness but who nonetheless fear the risk of adverse effects

from the drugs they used.[13] Unless meaningful restrictions are placed on this potential plaintiff class, the threat of numerous large, adverse monetary awards, coupled with the added cost of insuring against such liability (assuming insurance would be available), could diminish the availability of new, beneficial prescription drugs or increase their price beyond the reach of those who need them most. (Cf. *Brown, supra,* 44 Cal.3d at p. 1063 [emphasizing public policy favoring development and marketing of beneficial new drugs and relying on the same reasons in sharply limiting strict liability recovery against prescription drug manufacturers].)

Moreover, in *Burgess, supra,* 2 Cal.4th at pages 1082-1084, we acknowledged the importance of considering the impact of emotional distress liability on the "crisis" in the availability and cost of medical malpractice insurance. Although we were not persuaded in that case that the impact of such liability was sufficient to deny recovery for a mother's emotional distress arising from the negligent delivery of her baby, we observed, inter alia, that the class of potential plaintiffs in that type of situation was clearly limited. (2 Cal.4th at p. 1084.)

In stark contrast to the limited impact of emotional distress liability in the negligent delivery type of situation, fear of cancer liability in the context of physicians prescribing drugs will surely exacerbate the medical malpractice crisis. Specifically, for every patient who might actually develop cancer because of a particular drug, there could be hundreds or thousands of patients who might allege they were negligently prescribed the drug.[14] Not only will the additional expense of insuring against fear lawsuits and fear

---

[13]For example, numerous lawsuits were brought by those who ingested or whose mothers ingested the prescription drug diethylstilbestrol (DES). (E.g., *Brown* v. *Superior Court* (1988) 44 Cal.3d 1049 [245 Cal.Rptr. 412, 751 P.2d 470] [consolidated proceeding involving at least 69 cases] [hereafter *Brown*]; *Sindell* v. *Abbott Laboratories* (1980) 26 Cal.3d 588 [163 Cal.Rptr. 132, 607 P.2d 924] [brought as class action]; *Plummer* v. *Abbott Laboratories* (D.R.I. 1983) 568 F.Supp. 920 [51 plaintiffs]; *Wetherill, supra,* 565 F.Supp. 1553; *Payton, supra,* 437 N.E.2d 171 [class action]; *Morrissy* v. *Eli Lilly & Co.* (1979) 76 Ill.App.3d 753 [32 Ill.Dec. 30, 394 N.E.2d 1369] [two classes of DES daughters].) Although DES was widely marketed and prescribed as a preventative for miscarriage throughout the late 1940's through the 1960's, studies later indicated the drug was a carcinogen in females and their offspring. According to the DES lawsuits, manufacturers and physicians inadequately tested the drug and failed to provide warnings of its carcinogenic effects. In many of these suits, plaintiffs included fear of cancer claims. (E.g., *Plummer, supra,* 568 F.Supp. 920; *Wetherill, supra,* 565 F.Supp. 1553; *Payton, supra,* 437 N.E.2d 171.)

[14]In *Burgess, supra,* 2 Cal.4th at page 1083, we also expressed our hesitancy to limit emotional distress liability because the Medical Injury Compensation Reform Act of 1975 (Stats. 1975, chs. 1, 2, pp. 3949-4007) placed a cap of $250,000 on noneconomic damages that may be recovered in professional negligence actions involving health care providers. (Civ. Code, § 3333.2.) While such a cap may effectively ameliorate the impact of increasing costs of liability coverage and insurance in negligent delivery cases, it is unlikely to do so in

liability under these circumstances add to the cost of physician services, but physicians who would otherwise prescribe and administer new or innovative drugs might be discouraged from doing so for fear of potential liability. This would inhibit physicians in their ability to provide quality care to patients, as well as increase the practice of defensive medicine.

A third policy concern to consider is that allowing recovery to all victims who have a fear of cancer may work to the detriment of those who sustain actual physical injury and those who ultimately develop cancer as a result of toxic exposure. That is, to allow compensation to all plaintiffs with objectively reasonable cancer fears, even where the threatened cancer is not probable, raises the very significant concern that defendants and their insurers will be unable to ensure adequate compensation for those victims who actually develop cancer or other physical injuries. Consider, for instance, that in this case damages totalling $800,000 for fear of cancer were awarded to four plaintiffs. If the same recovery were to be allowed in large class actions, liability for this one type of injury alone would be staggering. As one commentator astutely noted: "It would be a regrettable irony if in the rush to compensate the psychically injured we make it impossible to compensate those suffering of permanent and serious physical injuries." (Willmore, *supra*, 3 Toxics L. Rptr. at p. 563.)

A fourth reason supporting the imposition of a more likely than not limitation is to establish a sufficiently definite and predictable threshold for recovery to permit consistent application from case to case. (See *Thing, supra*, 48 Cal.3d at p. 664; *Elden* v. *Sheldon* (1988) 46 Cal.3d 267, 276 [250 Cal.Rptr. 254, 758 P.2d 582].) Indeed, without such a threshold, the likelihood of inconsistent results increases since juries may differ over the point at which a plaintiff's fear is a genuine and reasonable fear, i.e., one jury might deem knowledge of a 2 or 5 percent likelihood of future illness or injury to be sufficient (cf. *Heider* v. *Employers Mutual Liability Ins. Co.* (La.Ct.App. 1970) 231 So.2d 438, 442 [affirming award for plaintiff's fear of becoming epileptic where experts estimated likelihood at 2 to 5 percent]), while another jury might not. A more definite threshold will avoid inconsistent results and may contribute to early resolution or settlement of claims.

Finally, while a more likely than not limitation may foreclose compensation to many persons with genuine and objectively reasonable fears, it is sometimes necessary to "limit the class of potential plaintiffs if emotional injury absent physical harm is to continue to be a recoverable item of damages in a negligence action." (*Thing, supra*, 48 Cal.3d at p. 666.) We

the context of fear claims over prescription drugs because the potential plaintiff class is vastly larger.

have recognized, in analogous contexts, that restricting the liability of a negligent tortfeasor for emotional loss may be warranted in consideration of the following factors: the intangible nature of the loss, the inadequacy of monetary damages to make whole the loss, the difficulty of measuring the damage, and the societal cost of attempting to compensate the plaintiff. (*Borer, supra*, 19 Cal.3d at pp. 447-449; *Baxter* v. *Superior Court* (1977) 19 Cal.3d 461, 464 [138 Cal.Rptr. 315, 563 P.2d 871] [refusing to recognize a parent's cause of action for loss of a child's consortium].) These considerations are equally relevant to fear of cancer claims in toxic exposure cases.

Plaintiffs and amici curiae advance several reasons why a more likely than not threshold for fear of cancer claims should be rejected. None is convincing.

First, plaintiffs argue that a more likely than not restriction is unworkable because the risk of contracting cancer from any one source is unquantifiable. In their view, adoption of such a rule would effectively preclude any emotional distress recovery.

We are unpersuaded by this argument because its factual premise appears highly suspect. Although the experts in this case asserted it was impossible to quantify the risk of cancer from any particular toxic exposure, experts in other cases do not share that view. For instance, in *Clark* v. *Taylor* (1st Cir. 1983) 710 F.2d 4, 14, an expert testified that the plaintiff's risk of developing bladder cancer had increased from one in ten thousand to one in ten as a result of his exposure to benzidine. In *Sterling, supra*, 855 F.2d 1188, 1205, the court found an increased risk for susceptibility to cancer of 25-30 percent. In *Pollock* v. *Johns-Manville Sales Corp.* (D.N.J. 1988) 686 F.Supp. 489, 490 (hereafter *Pollock*), an expert was prepared to testify that the plaintiff's exposure to asbestos resulted in a 43 percent chance of cancer. In *Dartez* v. *Fibreboard Corp.* (5th Cir. 1985) 765 F.2d 456, 466 (hereafter *Dartez*), an expert testified that a person employed as insulator, who smoked moderately and was exposed to asbestos, would have a risk of lung cancer approaching 50 percent. Finally, in both *Gideon* v. *Johns-Manville Sales Corp.* (5th Cir. 1985) 761 F.2d 1129, 1138 (hereafter *Gideon*), and *Jackson* v. *Johns-Manville Sales Corp.* (5th Cir.) 781 F.2d 394, 413, certiorari denied (1986) 478 U.S. 1022 [92 L.Ed.2d 743, 106 S.Ct. 3339], there was expert testimony in each case that the plaintiff had a greater than 50 percent risk of contracting cancer as a result of toxic exposure.

Second, plaintiffs and amici curiae point out that while decisions from other jurisdictions have employed a more likely than not limitation for the

so-called "increased risk" claim,[15] they have thus far declined to do so in the context of a fear of cancer claim. (E.g., *Sterling, supra,* 855 F.2d at pp. 1205-1206; *Lavelle* v. *Owens-Corning Fiberglas Corp.* (1987) 30 Ohio Misc.2d 11 [507 N.E.2d 476, 480-481] [hereafter *Lavelle*]; *In re Moorenovich* (D.Me. 1986) 634 F.Supp. 634, 636-637 [hereafter *Moorenovich*].) Those decisions, it is asserted, allowed recovery for a plaintiff's fear of cancer in situations similar to those present here without proof that cancer was more likely than not to occur. (*Sterling, supra,* 855 F.2d at p. 1206; *Moorenovich, supra,* 634 F.Supp. at p. 637; see also *Lavelle, supra,* 507 N.E.2d at p. 481; *Dartez, supra,* 765 F.2d at pp. 467-468.)

We remain unconvinced. Although it is true that the cited cases permitted fear of cancer recovery so long as the plaintiffs' fears were genuine and reasonable, many of them involved plaintiffs who, in addition to their emotional distress, sustained serious or permanent physical injury as a result of a particular toxic exposure. (*Sterling, supra,* 855 F.2d 1188 [kidney and liver damage, and numerous central nervous injuries]; *Lavelle, supra,* 507 N.E.2d 476, 478 [asbestosis]; *Dartez, supra,* 765 F.2d 456, 468 [plaintiff "injured" by accumulation of asbestos fibers in lungs].)[16] It is clear from passages in these cases that the respective courts were acutely aware of the

---

[15]An increased risk claim generally refers to a plaintiff who, as a result of a toxic exposure, suffers no presently existing physical injury but faces an increased risk of developing cancer or other illness in the future. The vast majority of courts that recognize increased risk claims require the plaintiff to demonstrate an actual risk or probability of developing cancer or other illness in the future as a result of the exposure. "While it is unnecessary that the medical evidence conclusively establish with absolute certainty that the future disease or condition will occur, mere conjecture or even possibility does not justify the court awarding damages for a future disability which may never materialize." (*Sterling, supra,* 855 F.2d at p. 1204.) Consistent with this reasoning, claims seeking recovery for future injuries that have less than a reasonable probability or medical certainty of occurring are denied as speculative. (See, e.g., *id,* at pp. 1204-1205; *Wehmeier* v. *UNR Industries, Inc.* (1991) 213 Ill.App.3d 6, 33-35 [157 Ill.Dec. 251, 572 N.E.2d 320, 338-339] [hereafter *Wehmeier*]; cf. *Pollock, supra,* 686 F.Supp. at pp. 491-492.)

As indicated in footnote 8, *ante,* the Court of Appeal in this case made a holding to the same effect.

[16]Another case cited by Justice George in his concurring and dissenting opinion also involved plaintiffs with permanent physical injuries. (Conc. & dis. opn. of George, J., *post,* at p. 1026, citing *Cantrell* v. *GAF Corp.* (6th Cir. 1993) 999 F.2d 1007 [both plaintiffs had asbestosis (lung disease), and one feared recurrence of cancer after his voice box had already been removed due to laryngeal cancer].)

Furthermore, Justice George's reliance on two other cases is misplaced. First, in *Merry* v. *Westinghouse Electric Corp.* (M.D.Pa. 1988) 684 F.Supp. 847, the district court denied a defendant's motion for summary judgment on the basis that there was an issue of fact as to whether plaintiffs could establish a "physical injury" or "physical impact" in order to recover emotional distress damages under Pennsylvania law. (684 F.Supp. at p. 852.) The discussion cited by Justice George was merely relevant to the *Merry* court's rejection of defendant's assertion that plaintiffs had not presented any proper proof of impact because they purportedly failed to present any medical evidence of the retention of chemicals in their bodies or the

plaintiffs' existing physical injuries and were deciding the appropriate basis for fear of cancer recovery in that context. (*Sterling, supra*, 855 F.2d at pp. 1205-1206;[17] *Lavelle, supra*, 507 N.E.2d at pp. 480-481 [although court recognized that Ohio law generally allows recovery of emotional distress damages without accompanying physical injury, court repeatedly referred to plaintiff as "asbestosis-afflicted"]; *Dartez, supra*, 765 F.2d at p. 468 [observing that Texas law recognized the right to compensation for mental distress where such distress is the natural result of a physical injury, and finding that plaintiff had been "injured" by the accumulation of asbestos fibers in his lungs].) Because these cases were decided within the context of a much narrower class of potential plaintiffs, they did not implicate or address the important public policy considerations at issue here.

Moreover, many of plaintiffs' cases do not warrant much weight because they were rendered by federal courts and have not been cited by the states whose laws they attempted to apply. For instance, in *Moorenovich, supra*, 634 F.Supp. 634, a federal district court applied a pure reasonableness standard for fear of cancer recovery in attempting to predict how the Maine Supreme Judicial Court would decide the issue. The court, apparently finding no Maine authorities involving fear of cancer claims, simply relied on a case that had allowed bystander recovery for foreseeable emotional distress suffered by a mother who saw her baby choke on a foreign substance in baby food. (634 F.Supp. at p. 637.) The Maine courts have not cited *Moorenovich, supra*, 634 F.Supp. 634, at all. (See also *Dartez, supra*, 765 F.2d 456 [fear analysis not discussed or adopted by Texas courts]; *Sterling, supra*, 855 F.2d 1188 [not cited by Tennessee courts].)

---

impingement of chemical particles on any internal organ. This court, however, is unanimous on the point that a physical impact (i.e., a toxic exposure), standing alone, is not sufficient for recovery of fear of cancer damages. Second, *Hagerty* v. *L & L Marine Services, Inc.* (5th Cir. 1986) 788 F.2d 315, 318, as modified on denial of rehearing en banc (1986) 797 F.2d 256, is of questionable significance because the Fifth Circuit indicated there that an "actionable injury" is required for fear of cancer recovery. Although it is unclear what was meant by "actionable injury," seven judges who had voted in favor of en banc consideration stated their belief that the Fifth Circuit would require a plaintiff to show either a traumatic event giving rise to physical or mental injury, or a physical injury resulting from the incremental effect of harmful substances. (797 F.2d 256 [dis. from denial of petn. for rehg. en banc of Jolly, J.].) If this is indeed the case, then the availability of fear of cancer damages in the Fifth Circuit is not as expansive as Justice George implies.

[17]In *Sterling, supra*, 855 F.2d 1188, the pertinent part of the court's analysis emphasized the concept of present physical injury no less than three times: "Mental distress, which results from fear *that an already existent injury* will lead to the future onset of an as yet unrealized disease, constitutes an element of recovery only where such distress is either foreseeable or is a natural consequence of, or reasonably expected to flow from, *the present injury*. . . . [M]ental anguish resulting from the chance *that an existing injury will lead to the materialization of a future disease* may be an element of recovery even though the underlying future prospect for susceptibility to a future disease is not, in and of itself, compensable inasmuch as it is not sufficiently likely to occur." (855 F.2d at pp. 1205-1206, italics added.)

Similarly, in *Lavelle, supra*, 507 N.E.2d 476, a lower court in Ohio simply followed state decisional law that recognized a separate cause of action for serious emotional distress without a contemporaneous physical injury. The lower court relied on state appellate authorities that were not decided in a fear of cancer context, and did not address the policy concerns identified in this case. *Lavelle, supra*, 507 N.E.2d 476, has not been cited by the Ohio appellate courts.

Accordingly, we decline to follow the rationale of the above cases, for to do so would be to ignore substantial public policy concerns.[18] We are satisfied that the more likely than not threshold for fear of cancer claims in negligence actions strikes the appropriate balance between the interests of toxic exposure litigants and the burdens on society and judicial administration.

To summarize, we hold with respect to negligent infliction of emotional distress claims arising out of exposure to carcinogens and/or other toxic substances: Unless an express exception to this general rule is recognized, in the absence of a present physical injury or illness, damages for fear of cancer may be recovered only if the plaintiff pleads and proves that (1) as a result of the defendant's negligent breach of a duty owed to the plaintiff, the plaintiff is exposed to a toxic substance which threatens cancer; *and* (2) the plaintiff's fear stems from a knowledge, corroborated by reliable medical or scientific opinion, that it is more likely than not that the plaintiff will develop the cancer in the future due to the toxic exposure. Under this rule, a plaintiff must do more than simply establish knowledge of a toxic ingestion or exposure and a significant increased risk of cancer. The plaintiff must further show that based upon reliable medical or scientific opinion, the plaintiff harbors a serious fear that the toxic ingestion or exposure was of such magnitude and proportion as to likely result in the feared cancer.

### 3. *Oppressive, Fraudulent or Malicious Conduct*

 Plaintiffs argue that if damages for fear of cancer in the absence of physical injury are limited to cases in which the cancer will more likely than

---

[18]Although amici curiae in support of plaintiffs rely in large part upon fear of cancer cases decided in the context of serious or permanent physical injury, they also discuss several cases in which physical injury apparently was lacking. (*Wilson, supra*, 701 P.2d 518; *Wetherill, supra*, 565 F.Supp. 1553; *Laxton* v. *Orkin Exterminating Co., Inc.* (Tenn. 1982) 639 S.W.2d 431.) We are not impressed by these cases as two of them would appear to allow recovery upon proof of mere ingestion of substances with known toxic or carcinogenic effects (*Wilson, supra*, 701 P.2d at p. 524; *Laxton, supra*, 639 S.W.2d at p. 434), and the other was decided by a federal district court attempting to predict whether and to what extent Illinois law would recognize a fear of cancer claim, and has not been cited by Illinois courts (*Wetherill, supra*, 565 F.Supp. 1553). Unlike amici curiae, we do not regard these decisions as evincing a clear national trend in the direction plaintiffs advocate.

not occur, the court should distinguish intentional conduct. We agree that certain aggravated conduct may warrant different treatment. In this part, we recognize an exception to the general rule set out above.

Plaintiffs suggest that the more likely than not threshold should not be applied where a defendant intentionally violates a statute or regulation prohibiting the disposal of toxins. Plaintiffs are quick to point out that the policy concerns for limiting liability in ordinary negligence cases are not triggered in cases involving such defendants.

Although an exception to the general rule appears appropriate, we do not believe it should focus on intentional violators of the law. For one thing, while a defendant may be aware that its conduct is wrong and potentially dangerous, it may not have knowledge of a particular statute or regulation proscribing it. There may be times where a defendant does not specifically intend to violate the law, yet the defendant proceeds to act egregiously in conscious disregard of others.

With these considerations in mind, we conclude it preferable to recognize an exception that focuses on the totality of circumstances in evaluating a defendant's conduct. ■ Accordingly, we hold that a toxic exposure plaintiff need not meet the more likely than not threshold for fear of cancer recovery in a negligence action if the plaintiff pleads and proves that the defendant's conduct in causing the exposure amounts to "oppression, fraud, or malice" as defined in Civil Code section 3294, which authorizes the imposition of punitive damages. Thus, for instance, fear of cancer damages may be recovered without demonstrating that cancer is probable where it is shown that the defendant is guilty of "despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (Civ. Code, § 3294, subd. (c)(1) [defining one type of malice].) "A person acts with conscious disregard of the rights or safety of others when [he] [she] is aware of the probable dangerous consequences of [his] [her] conduct and willfully and deliberately fails to avoid those consequences." (BAJI No. 14.71 (1992 rev.) (7th ed. pocket pt.) [defining "malice"].)

When a defendant acts with oppression, fraud or malice, no reason, policy or otherwise, justifies application of the more likely than not threshold. Any burden or consequence to society from imposing liability is offset by the deterrent impact of holding morally blameworthy defendants fully responsible for the damages they cause, including damage in the form of emotional distress suffered by victims of the misconduct who reasonably fear future cancer.

Under such circumstances, the potential liability of a defendant is not disproportionate to culpability. While the imposition of liability for emotional distress resulting from negligent handling of toxic substances may result in costs out of proportion to the culpability of the negligent actor, this concern is diminished or nonexistent when the conduct is despicable and undertaken in conscious disregard of the danger to the health or interests of others. The significance of the size of the potential class of plaintiffs is similarly diminished and the moral blame heightened since the defendant is aware of the danger posed by its conduct and acts in conscious disregard of the known risk. (Cf. *Amaya* v. *Home Ice, Fuel & Supply Co.* (1963) 59 Cal.2d 295, 315 [29 Cal.Rptr. 33, 379 P.2d 513], overruled on other grounds, *Dillon* v. *Legg* (1968) 68 Cal.2d 728, 748 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316] ["[T]he increased liability imposed on an intentional wrongdoer . . . reflect[s] the psychological fact that solicitude for the interests of the actor weighs less in the balance as his moral guilt increases and the social utility of his conduct diminishes."].) For these reasons, the more likely than not threshold should not be available as a shield when the defendant acts with a sufficient degree of moral blameworthiness.

■ Once the plaintiff establishes that the defendant has acted with oppression, fraud or malice, the plaintiff must still demonstrate that his or her fear of cancer is reasonable, genuine and serious in order to recover damages. In determining what constitutes reasonable fear, we refer to our previous discussion at part II.A.2.c., *ante*, in which we observed that it is not enough for a plaintiff to show simply an ingestion of a carcinogen or a significant increase in the risk of cancer. In addition, the plaintiff must show that his or her actual risk of cancer is significant before recovery will be allowed.[19] Under this reasoning, a plaintiff's fear is not compensable when the risk of cancer is significantly increased, but remains a remote possibility.

To reiterate, in the absence of a physical injury or illness, a plaintiff may recover damages for negligently inflicted emotional distress engendered by a fear of cancer without meeting the more likely than not threshold if the plaintiff pleads and proves that: (1) as a result of the defendant's negligent breach of a duty owed to the plaintiff, he or she is exposed to a toxic substance which threatens cancer; (2) the defendant, in breaching its duty to the plaintiff, acted with oppression, fraud or malice as defined in Civil Code

---

[19]We note that the terms "significant risk" and "no significant risk" have been specifically defined in different environmental statutes and regulations for various purposes. (See, e.g., Cal. Code Regs., tit. 22, §§ 12701-12721 [defining "no significant risk" with respect to notice requirements under the Safe Drinking Water and Toxic Enforcement Act of 1986, Health & Saf. Code, § 25249.5 et seq.].) Because these statutes and regulations do not pertain to recovery of fear of cancer damages, their definitions are not relevant on the issue of significant risk in this context.

section 3294;[20] *and* (3) the plaintiff's fear of cancer stems from a knowledge, corroborated by reliable medical or scientific opinion, that the toxic exposure caused by the defendant's breach of duty has significantly increased the plaintiff's risk of cancer *and* has resulted in an actual risk of cancer that is significant.

 In our view, Firestone's conduct brings this case within the "oppression, fraud or malice" exception for recovery of fear of cancer damages. The trial court determined that in May of 1977, officials in key management positions at Firestone's Salinas plant had increased knowledge regarding the dangers involved with the careless disposal of hazardous wastes, and had a specific, written policy for hazardous waste disposal. However, these officials, while professing support for the policy in written distributions, in actuality largely ignored the policy. The court found especially reprehensible the fact that Firestone, through its plant production manager, actively discouraged compliance with its internal policies and California law solely for the sake of reducing corporate costs. Under these circumstances, we believe there are sufficient facts supporting the trial court's conclusion that such conduct displayed a conscious disregard of the rights and safety of others.[21]

### B. *Intentional Infliction of Emotional Distress*

The trial court ruled that after May 1977, Firestone's continued dumping of its hazardous wastes at Crazy Horse amounted to outrageous conduct: "The materials were known to be and specifically designated as hazardous. It was clear that there was a great probability of these materials infiltrating and contaminating neighboring wells. Defendant had to realize that the eventual discovery of such a condition by those drinking the contaminated water would almost certainly result in their suffering severe emotional distress. In fact, with the knowledge that the defendant had at this time there also would have come an understanding of the dangerous condition that had been

---

[20]Civil Code section 3294 requires a plaintiff to prove oppression, fraud or malice by "clear and convincing evidence" for purposes of punitive damages recovery. We decline to impose this stringent burden of proof for recovery of fear of cancer damages in negligence cases for two reasons. First, we have already adopted strict limitations on the availability of damages for negligently inflicted fear of cancer; an additional hurdle at this point is unnecessary for public policy purposes. Second, to recover compensatory damages in an action for intentional infliction of emotional distress, a plaintiff need only prove the fact that a defendant intentionally inflicted such distress by a preponderance of the evidence. It is therefore both logical and consistent to utilize the same burden of proof for recovery of compensatory damages when a defendant has acted with "oppression, fraud or malice" to negligently inflict emotional distress.

[21]Although this case falls within the oppression, fraud or malice exception announced above, any award of fear of cancer damages will still depend on whether plaintiffs' fears are reasonable with reference to the actual likelihood of cancer due to the toxic exposure.

created by the dumping that had taken place over previous years. Nevertheless, defendant went ahead with its illegal dumping. This not only displayed a reckless disregard of the probability of causing emotional distress but also amounted to a ratification of its past acts in this regard." The court then determined that plaintiffs suffered severe emotional distress as a direct result of Firestone's intentional acts.

The Court of Appeal, relying on *Nally* v. *Grace Community Church of the Valley* (1988) 47 Cal.3d 278, 300 [253 Cal.Rptr. 97, 763 P.2d 948] and *Cole* v. *Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148, 155, footnote 7 [233 Cal.Rptr. 308, 729 P.2d 743], agreed that Firestone's conduct after 1977 was sufficiently extreme and outrageous to support liability for intentional infliction of emotional distress. The court noted in particular Firestone's knowledge of the health hazards posed by its dumping and its deliberate disregard of these hazards in an effort to cut costs.

We next consider whether Firestone was properly found liable for intentional infliction of emotional distress, and if not, whether the award for punitive damages is otherwise appropriate.

1. *The Christensen Requirements for Intentional Infliction of Emotional Distress*

After the Court of Appeal rendered its decision, we issued our opinion in *Christensen* v. *Superior Court, supra,* 54 Cal.3d 868 (hereafter *Christensen*), and asked the parties to address the impact of that opinion on the award of compensatory and punitive damages for intentional infliction of emotional distress in this case. As we will explain, it is questionable whether the record here supports a finding of intentional infliction of emotional distress by Firestone.

"The elements of the tort of intentional infliction of emotional distress are: ' "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. . . ." Conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community.' [Citation.] The defendant must have engaged in 'conduct intended to inflict injury or engaged in with the realization that injury will result.' [Citation.]" (*Christensen, supra,* 54 Cal.3d at p. 903.)

In *Christensen, supra,* we held that " '[t]he law limits claims of intentional infliction of emotional distress to egregious conduct *toward plaintiff* proximately caused by defendant.' [Citation.] The only exception to this rule is

that recognized when the defendant is aware, but acts with reckless disregard, of the plaintiff and the probability that his or her conduct will cause severe emotional distress to that plaintiff. [Citations.] Where reckless disregard of the plaintiff's interests is the theory of recovery, the presence of the plaintiff at the time the outrageous conduct occurs is recognized as the element establishing a higher degree of culpability which, in turn, justifies recovery of greater damages by a broader group of plaintiffs than allowed on a negligent infliction of emotional distress theory. [Citation.]" (*Christensen, supra,* 54 Cal.3d at pp. 905-906, italics in original, fn. omitted.)

■ Thus, "[i]t is not enough that the conduct be intentional and outrageous. It must be conduct *directed at the plaintiff*, or occur in the presence of a plaintiff *of whom the defendant is aware*." (*Christensen, supra,* 54 Cal.3d at p. 903, italics added.) "The requirement that the defendant's conduct be directed primarily at the plaintiff is a factor which distinguishes intentional infliction of emotional distress from the negligent infliction of such injury." (*Id.,* at p. 904; see *Ochoa* v. *Superior Court* (1985) 39 Cal.3d 159, 165, fn. 5 [216 Cal.Rptr. 661, 703 P.2d 1].)

■ In this case, it is ambiguous whether the lower courts determined that Firestone's conduct was directed at these particular plaintiffs in the sense intended by *Christensen, supra,* 54 Cal.3d at pages 903-906. Although the Court of Appeal correctly rejected Firestone's contention that Firestone was not liable because it did not know the particular names of any individual whose groundwater was contaminated by the hazardous waste, it is unclear whether it believed that Firestone was actually aware of the presence of these particular plaintiffs and their consumption and use of the water.

Furthermore, it is questionable whether the trial court made a finding that Firestone possessed the requisite knowledge, and if so, whether such a finding would be supported by substantial evidence.[22] Although the trial court concluded that Firestone "had to realize" that the eventual discovery of the toxic contamination "by those drinking the contaminated water would almost certainly result in their suffering severe emotional distress," this may be interpreted in one of two ways. First, this may have been a finding that Firestone actually knew of these particular plaintiffs and their consumption

[22]Firestone asserts in its brief on the merits that there is no evidence in the record showing that it knew of anyone living near Crazy Horse or that it had any interaction with plaintiffs. Plaintiffs do not specifically contest these assertions. Rather, they point out that Firestone was informed that Crazy Horse was not equipped to prevent toxins from leaching into the groundwater, that Firestone agreed not to send any toxic materials to the landfill, and that despite its knowledge that the reason for the no toxic requirement was to protect "plaintiffs' water source," Firestone chose to return the toxins to Crazy Horse where they found their way into the water source.

of the water, and nevertheless sent prohibited wastes to Crazy Horse despite a realization that plaintiffs would almost certainly suffer severe emotional distress upon their discovery of the facts. Alternatively, this may have been a finding that Firestone had to have realized that its misconduct was almost certain to cause severe emotional distress to any person who might foreseeably consume the water and subsequently discover the facts. Although the knowledge requirement is met under the first interpretation of the court's ruling, it is not satisfied under the second because knowledge of *these particular plaintiffs* is lacking.

This conclusion is consistent with the result reached in *Christensen, supra,* 54 Cal.3d 868, itself. There we held that, even though it was alleged that defendants' conduct in mishandling the remains of deceased persons was intentional and outrageous and was substantially certain to cause extreme emotional distress to relatives and close friends of the deceased, the plaintiffs' cause of action for intentional infliction of emotional distress was not sufficiently supported where there was no allegation that the defendants' misconduct was directed primarily at plaintiffs, or that it was calculated to cause them severe emotional distress, or that it was done with knowledge of their presence and with a substantial certainty that they would suffer severe emotional injury. (*Christensen, supra,* 54 Cal.3d at pp. 903, 906.)

### 2. *Threshold for Recovery*

 For guidance of the lower courts should the Court of Appeal determine that a retrial on this claim is appropriate, we hold that recovery of fear of cancer damages in actions for intentional infliction of emotional distress should not depend on a showing of a medically corroborated belief that it is more likely than not that the plaintiff will develop the feared cancer as a result of the toxic exposure.

The reasons for not applying the more likely than not threshold are obvious. First, the intentional infliction cause of action requires a showing of "extreme and outrageous conduct" which is directed at the plaintiff. (*Christensen, supra,* 54 Cal.3d at p. 903.) Thus, a high degree of culpability is required which justifies recovery of greater damages by a broader group of plaintiffs than allowed in an ordinary negligence action. (See *id.,* at p. 906.) Moreover, where a defendant undertakes extreme and outrageous conduct toward the plaintiff, the concern that liability will be imposed out of proportion to fault is not present. Finally, the requirement of extreme and outrageous conduct directed at the plaintiff places adequate limitations on the class of potential plaintiffs who might sue for fear of cancer under this theory. Therefore, the public policy concerns supporting application of the heightened threshold (see pt. II.A.2.c., *ante*) are not implicated.

 Of course, even though the heightened threshold is not applicable in intentional infliction actions, it must nevertheless be established that the plaintiff's fear of cancer is reasonable, that is, that the fear is based upon medically or scientifically corroborated knowledge that the defendant's conduct has significantly increased the plaintiff's risk of cancer and that the plaintiff's actual risk of the threatened cancer is significant. Reasonableness of the fear is required because in intentional infliction actions, recovery is allowed only for "severe or extreme emotional distress." (*Christensen, supra,* 54 Cal.3d at p. 903.) Severe emotional distress means " 'emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it.' " (*Girard* v. *Ball* (1981) 125 Cal.App.3d 772, 787-788 [178 Cal.Rptr. 406], citing *Fletcher* v. *Western Life Ins. Co.* (1970) 10 Cal.App.3d 376, 397 [89 Cal.Rptr. 78, 47 A.L.R.3d 286]; see Rest.2d Torts, § 46, com. j, p. 78 ["distress must be reasonable and justified under the circumstances"].)

### 3. *Punitive Damages*

 As indicated in part II.A.3., *ante,* we believe there is sufficient evidence to support the trial court's conclusion that Firestone acted reprehensibly in conscious disregard of the rights and safety of others. But because the trial court was of the view that Firestone's conduct constituted intentional infliction of emotional distress when it assessed punitive damages against Firestone, and might not have made the award or might have awarded a lesser sum had it not made that finding, that aspect of the judgment should also be reversed. It is not necessary therefore to consider Firestone's several challenges to the propriety of awarding punitive damages in this case. For guidance of the court should there be a retrial we note, however, that punitive damages sometimes may be assessed in unintentional tort actions under Civil Code section 3294 (see *SKF Farms* v. *Superior Court* (1984) 153 Cal.App.3d 902, 907 [200 Cal.Rptr. 497]; *Grimshaw* v. *Ford Motor Co.* (1981) 119 Cal.App.3d 757, 811 [174 Cal.Rptr. 348] [no constitutional infirmity in applying Civ. Code, § 3294 to unintentional tort]), so long as "actual, substantial damages" have been awarded (see *Kizer* v. *County of San Mateo* (1991) 53 Cal.3d 139, 147 [279 Cal.Rptr. 318, 806 P.2d 1353] ["actual damages are an absolute predicate for an award of punitive damages"]; *Bezaire* v. *Fidelity & Deposit Co.* (1970) 12 Cal.App.3d 888, 892 [91 Cal.Rptr. 142]).

### C. *Medical Monitoring Costs*

In the context of a toxic exposure action, a claim for medical monitoring seeks to recover the cost of future periodic medical examinations intended to

facilitate early detection and treatment of disease caused by a plaintiff's exposure to toxic substances. (*Ayers* v. *Jackson Tp.* (1987) 106 N.J. 557 [525 A.2d 287, 308, 76 A.L.R.4th 571] [hereafter *Ayers*].) We shall now undertake to decide whether and under what circumstances a toxic exposure plaintiff may recover medical monitoring damages in a negligence action.

The trial court awarded medical monitoring damages to plaintiffs, determining that "[s]ince plaintiffs must now live with an increased vulnerability to serious disease it is axiomatic that they should receive periodic medical monitoring in order to determine at the earliest possible time the onset of disease." The Court of Appeal reversed. Citing Civil Code section 3283,[23] the court concluded that such an award must be based upon either a present physical injury or a threat of a future injury that is more likely than not to occur, and that neither had been demonstrated here.

Firestone and amici curiae urge us to affirm the Court of Appeal judgment in this regard. Essentially, Firestone, amici curiae, and the Court of Appeal assume that the reasonableness of medical intervention, and hence compensability, is dependent upon the sufficiency of proof that the occurrence of the disease is reasonably certain. Firestone points to various cases in other jurisdictions that share similar views. (E.g., *Ball* v. *Joy Manufacturing Co.* (S.D.W.Va. 1990) 755 F.Supp. 1344, 1372 [denying medical monitoring damages where plaintiff had not suffered present demonstrable injury]; *Villari* v *Terminix International, Inc.* (E.D.Pa. 1987) 663 F.Supp. 727, 735 [observing that, under Pennsylvania law, plaintiff seeking costs of medical surveillance as element of damages must demonstrate some physical injury].)

We are not convinced by these decisions and find the Court of Appeal's analysis in *Miranda* v. *Shell Oil Co.* (1993) 17 Cal.App.4th 1651 [15 Cal.Rptr.2d 569] (hereafter *Miranda*) persuasive. In *Miranda*, the court observed that "[t]he cost of anticipated medical care reasonably certain to be required in the future has long been held to be a proper item of recoverable damages under [Civil Code section 3333].[24] (*Buswell* v. *City and County of San Francisco* (1948) 89 Cal.App.2d 123, 133 [200 P.2d 115].) In our view, expenditures for prospective medical testing and evaluation, which would be unnecessary if the particular plaintiff had not been wrongfully exposed to pollutants, are a correlative detriment within section 3333. (See [*In re Paoli*

---

[23]Civil Code section 3283 provides: "Damages may be awarded, in a judicial proceeding, for detriment resulting after the commencement thereof, or certain to result in the future."

[24]Civil Code section 3333 sets forth the measure of damages applicable to tortious conduct: "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."

*R.R. Yard PCB Litigation* (3d Cir. 1990) 916 F.2d 829, 852]; and *Coover* v. *Painless Parker, Dentist* (1930) 105 Cal.App. 110, 115 [286 P. 1048].) Thus, such a plaintiff may collect damages from the tortfeasor measured by the 'reasonable medical and other expenses' to be incurred for monitoring. (Rest.2d Torts, § 924; see [citations].)

"We have found no authority which limits the applicability of Civil Code section 3333 to those situations where physical injury is evident. Civil Code section 3282 defines 'detriment' as 'a loss or harm suffered in person or property.' 'Harm,' under the Restatement Second of Torts means 'the existence of loss or detriment in fact *of any kind* to a person . . . .' (Rest.2d Torts, § 7, subd. (2), italics added.) The Restatement distinguishes 'physical harm' by classifying it as 'the physical impairment of the human body, or of land or chattels.' ([*Id.,*] § 7, subds. (2) and (3).) According to the Restatement's analysis, a plaintiff is entitled to recover damages from the tortfeasor for all 'harm'—as opposed to 'physical harm'—'past, present and prospective, legally caused by the tort.' ([*Id.,*] § 910; see also [*id.,*] § 7, com. d.; & [*id.,*] § 917." (*Miranda, supra,* 17 Cal.App.4th at pp. 1656-1657.)

In holding that recovery of medical monitoring damages is not contingent upon a showing of a present physical injury or upon proof that injury is reasonably certain to occur in the future, the *Miranda* court aligned itself with a number of other courts that have considered the issue. (E.g., *Ayers, supra,* 525 A.2d 287, 312-313; *In re Paoli R.R. Yard PCB Litigation* (3d Cir. 1990) 916 F.2d 829, 852 [hereafter *In re Paoli*]; *Burns* v. *Jaquays Mining Corp.* (1987) 156 Ariz. 375 [752 P.2d 28, 33].) Consistent with these other decisions, the court determined that such recovery was not available solely upon proof of an exposure to toxic chemicals; rather, there must be a further showing that the need for monitoring is a reasonably certain consequence of the exposure, based upon a consideration of at least the following five factors: (1) the significance and extent of the plaintiff's exposure to the chemicals; (2) the relative toxicity of the chemicals; (3) the seriousness of the diseases for which plaintiff is at an increased risk; (4) the relative increase in the plaintiff's chances of developing a disease as a result of the exposure, when compared to (a) plaintiff's chances of developing the disease had he or she not been exposed, and (b) the chances of members of the public at large of developing the disease; and (5) the clinical value of early detection and diagnosis. (*Miranda, supra,* 17 Cal.App.4th at pp. 1657-1658, citing *Ayers, supra,* 525 A.2d at p. 312.)[25]

Like the court in *Miranda, supra,* 17 Cal.App.4th 1651, and *Ayers, supra,* 525 A.2d 287, we conclude that a reasonably certain need for medical

[25]The court in *Ayers* phrased the test slightly differently: "[T]he cost of medical surveillance is a compensable item of damages where the proofs demonstrate, through reliable expert testimony predicated upon the significance and extent of exposure to chemicals, the toxicity

monitoring is an item of damage for which compensation should be allowed. Recognition that a defendant's conduct has created the need for future medical monitoring does not create a new tort. It is simply a compensable item of damage when liability is established under traditional tort theories of recovery.

That medical monitoring may be called for as a result of a defendant's tortious conduct, even in the absence of actual physical injury, was compellingly demonstrated in the case of *Friends For All Children, Inc.* v. *Lockheed Aircraft Corp.* (D.C. Cir. 1984) 746 F.2d 816 [241 App.D.C. 83, 46 A.L.R.4th 1113] [hereafter *Friends For All Children*]. There, suit was instituted on behalf of 149 Vietnamese orphaned children who survived a plane crash during the evacuation of Vietnam in 1975. The complaint alleged that because of decompression, as well as the impact of the crash, the children suffered from a neurological disorder generically classified as minimal brain dysfunction. In that case, the Court of Appeals affirmed the imposition of liability on Lockheed for diagnostic examination expenses because the crash proximately caused the need for a comprehensive diagnostic examination. (746 F.2d at pp. 825-826.) In doing so, the court rejected the argument that the need for diagnostic examination was not a compensable injury, and, as did the court in *Miranda, supra,* 17 Cal.App.4th at page 1657, cited with approval the Restatement's definition of injury as " 'the invasion of any legally protected interest of another.' " (746 F.2d at p. 826, citing Rest.2d Torts, § 7.) Consequently, the court in *Friends For All Children, supra,* 746 F.2d at page 826, held that a reasonable need for medical examinations was itself compensable, without proof of other injury: "It is difficult to dispute that an individual has an interest in avoiding expensive diagnostic examinations just as he or she has an interest in avoiding physical injury. When a defendant negligently invades this interest, the injury to which is neither speculative nor resistant to proof, it is elementary that the defendant should make the plaintiff whole by paying for the examinations." (Fn. omitted.)[26]

It bears emphasizing that allowing compensation for medical monitoring costs "does not require courts to speculate about the probability of future

---

of the chemicals, the seriousness of the diseases for which individuals are at risk, the relative increase in the chance of onset of disease in those exposed, and the value of early diagnosis, that such surveillance to monitor the effect of exposure to toxic chemicals is reasonable and necessary." (525 A.2d at p. 312.)

[26]The court in *Friends For All Children* posed the following hypothetical situation to illustrate the true nature of medical monitoring damages. "Jones is knocked down by a motorbike which Smith is riding through a red light. Jones lands on his head with some force. Understandably shaken, Jones enters a hospital where doctors recommend that he undergo a battery of tests to determine whether he has suffered any internal head injuries. The tests prove negative, but Jones sues Smith solely for what turns out to be the substantial cost of the diagnostic examinations. [¶] From our example, it is clear that even in the absence of physical injury Jones ought to be able to recover the cost for the various diagnostic examinations

injury. It merely requires courts to ascertain the probability that the far less costly remedy of medical supervision is appropriate." (*In re Paoli, supra,* 916 F.2d at p. 852.) Indeed, "[s]cience may well counsel medical intervention with respect to a known health risk long before it reaches the point where the law would regard its occurrence as 'reasonably certain.' [Citation.]" (*Miranda, supra,* 17 Cal.App.4th at p. 1658.) We are therefore persuaded that recovery of medical monitoring damages should not be dependent upon a showing that a particular cancer or disease is reasonably certain to occur in the future.

Finally, as *Miranda, supra,* 17 Cal.App.4th 1651, and other cases have stressed, recovery of medical monitoring costs is supported by a number of sound public policy considerations. First, there is an important public health interest in fostering access to medical testing for individuals whose exposure to toxic chemicals creates an enhanced risk of disease, particularly in light of the value of early diagnosis and treatment for many cancer patients. (*Ayers, supra,* 525 A.2d at p. 311; *Miranda, supra,* 17 Cal.App.4th at p. 1660.) Second, there is a deterrence value in recognizing medical surveillance claims—"[a]llowing plaintiffs to recover the cost of this care deters irresponsible discharge of toxic chemicals by defendants . . . ." (*In re Paoli, supra,* 916 F.2d at p. 852; *Miranda, supra,* 17 Cal.App.4th at p. 1660; *Ayers, supra,* 525 A.2d at pp. 311-312; cf. *Friends For All Children, supra,* 746 F.2d at p. 825].) Third, "[t]he availability of a substantial remedy before the consequences of the plaintiffs' exposure are manifest may also have the beneficial effect of preventing or mitigating serious future illnesses and thus reduce the overall costs to the responsible parties." (*Ayers, supra,* 525 A.2d at p. 312; see *Miranda, supra,* 17 Cal.App.4th at p. 1660.) In this regard, the early detection of cancer may improve the prospects for cure, treatment, prolongation of life and minimization of pain and disability. Finally, societal notions of fairness and elemental justice are better served by allowing recovery of medical monitoring costs. That is, it would be inequitable for an individual wrongfully exposed to dangerous toxins, but unable to prove that cancer or disease is likely, to have to pay the expense of medical monitoring when such intervention is clearly reasonable and necessary. (*Ayers, supra,* 525 A.2d at p. 312; see *Miranda, supra,* 17 Cal.App.4th at p. 1660.)

In light of the foregoing, we believe the *Miranda* court's analysis appropriately recognizes that medical science may necessarily and properly intervene in the absence of physical injury where there is a significant but not

---

proximately caused by Smith's negligent action. . . . The motorbike rider, through his negligence, caused the plaintiff, in the opinion of medical experts, to need specific medical services—a cost that is neither inconsequential nor of a kind the community generally accepts as part of the wear and tear of daily life. Under these principles of tort law, the motorbiker should pay." (746 F.2d at p. 825.)

necessarily likely risk of serious disease. Accordingly, consistent with *Miranda, supra,* 17 Cal.App.4th 1651, and the cases cited above, we hold that the cost of medical monitoring is a compensable item of damages where the proofs demonstrate, through reliable medical expert testimony, that the need for future monitoring is a reasonably certain consequence of a plaintiff's toxic exposure and that the recommended monitoring is reasonable. In determining the reasonableness and necessity of monitoring, the following factors are relevant: (1) the significance and extent of the plaintiff's exposure to chemicals; (2) the toxicity of the chemicals; (3) the relative increase in the chance of onset of disease in the exposed plaintiff as a result of the exposure, when compared to (a) the plaintiff's chances of developing the disease had he or she not been exposed, and (b) the chances of the members of the public at large of developing the disease; (4) the seriousness of the disease for which the plaintiff is at risk; and (5) the clinical value of early detection and diagnosis. Under this holding, it is for the trier of fact to decide, on the basis of competent medical testimony, whether and to what extent the particular plaintiff's exposure to toxic chemicals in a given situation justifies future periodic medical monitoring.

We are confident that our holding will not, as Firestone and amici curiae warn, open the floodgates of litigation. The five factors provide substantial evidentiary burdens for toxic exposure plaintiffs and do not, as Firestone insists, allow medical monitoring damages to be based "solely upon a showing of an increased but unquantified risk resulting from exposure to toxic chemicals." ▮▮▮ Moreover, toxic exposure plaintiffs may recover "only if the evidence establishes the necessity, as a direct consequence of the exposure in issue, for specific monitoring beyond that which an individual should pursue as a matter of general good sense and foresight." (*Miranda, supra,* 17 Cal.App.4th at p. 1660.)[27] Thus there can be no recovery for preventative medical care and checkups to which members of the public at large should prudently submit. (17 Cal.App.4th at p. 1660.) Finally, contrary to the protestations of Firestone and amici curiae, medical monitoring costs are not speculative because they are based upon the specific dollar costs of

---

[27]Firestone complains that a deep-pocket defendant should not be forced to finance a plaintiff's long-term health care needs where the plaintiff has a preexisting health condition from having voluntarily exposed himself or herself to far larger quantities of carcinogens, for example, by smoking. (See pt. II.D., *post.*) While there is no question that a defendant ought not to be liable for medical monitoring of a plaintiff's preexisting condition that is unaffected by a subsequent toxic exposure negligently caused by the defendant, we see no reason why the defendant should not be held responsible for any increased or different monitoring of the preexisting condition (whether or not the preexisting condition is caused by the plaintiff's voluntary conduct) where necessitated as a direct result of the subsequent exposure.

reasonable and necessary periodic examinations. (See *Ayers*, *supra*, 525 A.2d at p. 313.)[28]

## D. *Smoking and Comparative Fault*

In this case, all four plaintiffs were long-time cigarette smokers. Cigarette smoke evidently contains 40,000 to 60,000 parts per billion (ppb) of benzene—more than 2,500 times the concentration detected in plaintiffs' contaminated water.[29] We now consider what effect, if any, should be given to the evidence that plaintiffs, on their own, voluntarily ingested this toxic substance.

In its statement of decision, the trial court commented: "Defendant points out that plaintiffs have made themselves more susceptible to illness from smoking cigarettes. Although this is no doubt true, it does not relieve defendant from accountability for burdening plaintiffs with a significantly greater vulnerability to serious disease through the ingestion of defendant's toxins."

■ On appeal, Firestone argued that under comparative fault principles, plaintiffs' smoking should reduce or entirely preclude their recovery for fear of cancer. The Court of Appeal rejected this argument, reasoning: "Comparative fault is applicable only if the plaintiff's negligence is a proximate cause of the injury. 'Negligence unrelated to the cause or causes of the accident is not a bar.' [Citations.] In this case, the fact that [plaintiffs] smoked cigarettes is wholly unrelated to the circumstances which caused [plaintiffs'] water supply to be contaminated with toxics. For comparative

[28]Various commentators and courts have suggested that creation of court-supervised funds to pay medical monitoring claims as they accrue, rather than the award of a lump-sum verdict, may be a more appropriate mechanism for compensating plaintiffs in a toxic exposure case. (See generally, McCarter, *Medical Sue-Veillance: A History and Critique of the Medical Monitoring Remedy in Toxic Tort Litigation* (1993) 45 Rutgers L.Rev. 227, 253-264, and cases cited therein.)

In *Ayers*, *supra*, 525 A.2d 287, 314, the court observed: "Although conventional damage awards do not restrict plaintiffs in the use of money paid as compensatory damages, mass-exposure toxic tort cases involve public interests not present in conventional tort litigation. The public health interest is served by a fund mechanism that encourages regular medical monitoring for victims of toxic exposure." (*Id.*, at p. 314.) Thus, in contrast to a lump-sum payment, a fund remedy will encourage plaintiffs to spend money to safeguard their health by not allowing them the option of spending the money for other purposes. The fund remedy will also assure that medical monitoring damages will be paid only to compensate for medical examinations and tests actually administered, thus serving to limit the liability of defendants to the amount of expenses actually incurred. (*Ibid.*) In turn, this should tend to reduce insurance costs, both to potential defendants and the general public alike.

[29]According to plaintiffs' evidence, the average concentration of benzene was 19.46 ppb in the Potters' well and 19.38 ppb in the Plescias' well.

fault principles to apply, [plaintiffs'] conduct would have had to contribute, in some manner, to this contamination."

We agree with Firestone that the Court of Appeal erred in its reasoning. Under comparative fault principles, damages are apportioned based upon the various causes contributing to a plaintiff's *harm*, as opposed to a particular defendant's *negligence*. (*Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804, 813 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393] [hereafter *Li*] ["liability for damage will be borne by those whose negligence caused it in direct proportion to their respective fault"]; see *Garcia* v. *Estate of Norton* (1986) 183 Cal.App.3d 413, 421 [228 Cal.Rptr. 108] [recognizing that in actions founded on strict products liability, a plaintiff's recovery must be reduced to the extent that his own lack of reasonable care contributed to his injury].) Therefore, the fact that plaintiffs' smoking did not contribute to the contamination of their well water is not determinative.

Nonetheless, we agree with the Court of Appeal's ultimate conclusion that comparative fault principles were not properly invoked in this case. Firestone failed to establish a causal link between plaintiffs' smoking and the harm they suffered, i.e., their fear of a significantly increased risk of cancer. As plaintiffs point out, Firestone apparently introduced no evidence at trial suggesting that any portion of plaintiffs' fear was attributable to their own smoking.[30]

 In other cases, however, when a defendant demonstrates that a plaintiff's smoking is negligent and that a portion of the plaintiff's fear of developing cancer is attributable to the smoking, comparative fault principles may be applied in determining the extent to which the plaintiff's emotional distress damages for such fear should be reduced to reflect the proportion of such damages for which the plaintiff should properly bear the responsibility. (See *Li, supra*, 13 Cal.3d at p. 813.)

Finally, we also observe that evidence of smoking by a plaintiff is relevant to whether the plaintiff's fear is reasonable and genuine. Thus, if a plaintiff had smoked heavily for 20 years without fearing cancer, the trier of fact may

---

[30]Unlike the cases relied upon by Firestone and amici curiae (see, e.g., *Brisboy* v. *Fibreboard Corp.* (1988) 429 Mich. 540, 552 [418 N.W.2d 650, 655]; *Wehmeier, supra*, 213 Ill.App.3d at p. 35 [572 N.E.2d at pp. 339-340]; *Gideon, supra*, 761 F.2d at p. 1139), the harm for which damages were awarded in this case was not cancer or increased risk of cancer. Rather, the harm for which damages were awarded was the emotional distress plaintiffs suffered on learning that they ingested carcinogens released into their water supply by Firestone and the resulting significant increase in their risk of cancer. Therefore, the critical issue is not whether plaintiffs' smoking contributed to their increased risk of cancer, it is whether their smoking contributed to their emotional distress.

consider that evidence in assessing the legitimacy of the plaintiff's fear of cancer claim.[31]

## III.

### Disposition

The judgment of the Court of Appeal is reversed insofar as it affirms the award of punitive damages and the award of damages for plaintiffs' fear of cancer, and reverses the award for future medical monitoring. The cause is remanded to the Court of Appeal for further proceedings consistent with this opinion, that may include, if appropriate, a remand to the trial court for a retrial on the above damages, a remand for a retrial on the issue of Firestone's liability for intentional infliction of emotional distress, and/or consideration of issues that were not heretofore reached by the Court of Appeal.

Lucas, C. J., Panelli, J., and Arabian, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in the majority opinion to the extent it recognizes a cause of action in negligence for causing fear of cancer in the absence of a claim of physical injury or disease. I also concur in the majority opinion's treatment of Firestone's comparative fault claim, and I concur in the opinion to the extent it reverses the judgment of the Court of Appeal on the cause of action for medical monitoring costs.

I disagree with the majority in two respects. First, I agree with Justice George's contention that when a defendant negligently exposes a plaintiff to carcinogenic toxins, plaintiff's recovery for resulting fear of cancer should not depend on proof that it is probable the cancer will actually occur. As Justice George demonstrates, under settled tort principles, proof of the emotional damage flowing from defendant's negligent act should not depend on proof of the probable occurrence of the disease.

---

[31]Firestone additionally argues that an award for medical monitoring costs to a plaintiff who smokes should also be reduced to take into account the plaintiff's smoking. As indicated in part II.C., *ante* (fn. 27), even if a defendant negligently exposes a smoker to toxins that significantly increase the smoker's risk of cancer, that defendant is not liable for reasonably certain future medical monitoring costs unless the recommended monitoring calls for tests or examinations that are in addition to or different from the type of monitoring that the smoker should prudently undertake regardless of the subsequent toxic exposure. However, if additional or different tests and examinations are necessitated as a result of the toxic exposure caused by the defendant, then the defendant bears full responsibility for their costs. The costs of additional or different monitoring made necessary by the defendant's conduct should not have to be shared by the plaintiff since the plaintiff already remains responsible for any monitoring that is shown to be medically advisable due solely to his or her smoking or other preexisting condition.

I also agree with Justice Kennard that the majority err in creating an anomalous new cause of action in negligence requiring proof of malicious conduct. When it is shown that the defendant has acted with conscious disregard of the plaintiff's health and safety in exposing the plaintiff to carcinogenic toxins, the plaintiff may state a claim for an intentional tort. I write separately, however, because I am convinced this case readily fits the rubric of intentional infliction of emotional distress. I would affirm the judgment of the Court of Appeal on this cause of action without remand for retrial.

We recently restated the elements of a cause of action for intentional infliction of emotional distress. They are: "(i) outrageous conduct by defendant, (ii) an intention by defendant to cause, or *reckless disregard of the probability of causing, emotional distress*, (iii) severe emotional distress, and (iv) an actual and proximate causal link between the tortious conduct and the emotional distress." (*Nally* v. *Grace Community Church* (1988) 47 Cal.3d 278, 300 [253 Cal.Rptr. 97, 763 P.2d 948], italics added; see also *Christensen* v. *Superior Court* (1991) 54 Cal.3d 868, 903 [2 Cal.Rptr.2d 79, 820 P.2d 181] [*Christensen*].) Furthermore, the defendant "must have engaged in 'conduct intended to inflict injury or engaged in with the realization that injury will result.'" (*Christensen, supra,* 54 Cal.3d at p. 903, quoting *Davidson* v. *City of Westminster* (1982) 32 Cal.3d 197, 210 [185 Cal.Rptr. 252, 649 P.2d 894].)

This case falls into the category of "reckless disregard of the probability of causing emotional distress." As the Court of Appeal observed, the defendants knew that the wastes they deposited at the Crazy Horse dump would pose a health hazard to anyone near the dump. The defendants were aware that it was prohibited to dump toxic waste at the Crazy Horse dump because of the danger such waste would leach into and contaminate the groundwater. They agreed not to dump toxic wastes at the dump, but, knowing of the danger to users of the local water supply, they nevertheless intentionally dumped carcinogenic toxic waste there. Thus defendants created a probability that once their illegal and ultrahazardous conduct was discovered, it would cause emotional distress to those who used the local water supply. It seems clear that this conduct meets the definition of reckless conduct in the context of the tort of intentional infliction of emotional distress.

The majority, however, relying on this court's misguided discussion in *Christensen, supra,* 54 Cal.3d 868, 903-904, would require plaintiffs in toxic exposure cases to show that the reckless defendant directed his or her conduct at the plaintiffs in particular, knowing of their individual presence in harm's way. (Maj. opn., *ante,* at pp. 1001-1003.)

It is inconsistent with the definition of recklessness to require that the defendant direct his or her conduct at, or be aware of, particular plaintiffs. By definition, a reckless person acts in culpable *disregard* of the results of his or her conduct. In this state, "[a] defendant's conduct is in reckless disregard of the probability of causing emotional distress if [he] [she] has knowledge of a high degree of probability that emotional distress will result and acts with deliberate disregard of that probability or with a conscious disregard of the probable results." (BAJI No. 12.77 (1992 re-rev.) (7th ed. pocket pt.) p. 27; see *Spackman* v. *Good* (1966) 245 Cal.App.2d 518, 530 [54 Cal.Rptr. 78]; see also *Davidson* v. *City of Westminster, supra,* 32 Cal.3d at p. 210; *Ledger* v. *Tippitt* (1985) 164 Cal.App.3d 625, 642 [210 Cal.Rptr. 814].)

The Restatement Second of Torts explains that intentional infliction of emotional distress may be actionable when defendant's conduct is reckless: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress . . . ." (Rest.2d Torts, § 46.) A comment to this section explains: "The rule stated in this Section applies where the actor desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct. *It applies also where he acts recklessly*, as that term is defined in § 500, *in deliberate disregard* of a high degree of probability that the emotional distress will follow." (Rest.2d Torts, *supra*, § 46, com. i, p. 77, italics added.)

Section 500 defines reckless disregard of the safety of others as: "The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent." (Rest.2d Torts, *supra*, § 500.) Although the culpable act must be intentional, "the actor does not intend to cause the harm which results from it. It is enough that he realizes or from facts which he knows, *should* realize that there is a strong probability that harm may result . . . ." (Rest.2d Torts, *supra*, § 500, com. f, p. 590, italics added.)

Most significantly, the Restatement would not require that the actor be aware that any particular person is in the zone of danger caused by the culpable act: "If the actor's conduct is such as to involve a high degree of risk that serious harm will result from it to anyone who is within range of its effect, the fact that he knows or has reason to know that others are within such range is conclusive of the recklessness of his conduct toward them. *It is*

*not, however, necessary that the actor know that there is anyone within the area made dangerous by his conduct. It is enough that he knows that there is strong probability that others may rightfully come within such zone.*" (Rest.2d Torts, *supra*, § 500, com. d, p. 589, italics added.)

Under these standards, there should be no requirement that plaintiffs show that defendants were aware of their individual existence or that defendants directed their hazardous conduct against identifiable persons in particular. Defendants should have realized the probability that their hazardous conduct would cause emotional distress, and they must be charged with knowledge that there was a strong probability that others would come within the zone of danger of their conduct. They knew the reason that their conduct was prohibited was to protect all persons who lived near the dump.

Accordingly, I would affirm the judgment of the Court of Appeal with respect to the cause of action for intentional infliction of emotional distress.

**KENNARD, J.,** Concurring and Dissenting.—I concur in the judgment and in much of the reasoning of the majority opinion. In particular, I agree with the majority that recovery of fear-of-cancer damages in toxic exposure cases not involving immediate physical injury should be subject to the following conditions: When a defendant has caused the plaintiff to unknowingly ingest toxic chemicals by an act or omission that is merely negligent, the plaintiff may recover damages for emotional distress caused by fear of future cancer only upon proof of a more-than-even chance that cancer will actually develop. But when the defendant has acted with conscious disregard of the plaintiff's health and safety—and thereby demonstrated a level of moral culpability significantly beyond mere negligence—then the plaintiff may recover fear-of-cancer damages whenever the plaintiff's resulting emotional distress is genuine, serious, and reasonable.

My disagreement with the majority is only about the legal pigeonhole in which to situate the liability imposed in the latter situation. The majority places this liability within the tort of negligence, even though proof of malice will be indispensable to recovery for emotional distress, which may be the plaintiff's only compensable injury. This seems to me a poor fit at best, and one that cannot long endure. Surely the law of negligence, and especially its rules for recovery of emotional distress damages, are complicated enough without establishing a subspecies of negligence liability requiring proof of malicious conduct. The goal of simplicity and clarity in the law would be better served, in my view, by placing the liability for maliciously caused fear of cancer somewhere within the family of intentional or quasi-intentional torts.

Among the existing tort categories, liability for maliciously induced fear of cancer fits most comfortably within the tort of willful misconduct.[1] This is "a tort separate and distinct from negligence and involves different principles of liability and different defenses." (*Palazzi* v. *Air Cargo Terminals, Inc.* (1966) 244 Cal.App.2d 190, 195 [52 Cal.Rptr. 817]; see *Shepardson* v. *McLellan* (1963) 59 Cal.2d 83, 89 [27 Cal.Rptr. 884, 378 P.2d 108]; *Savage* v. *Van Marle* (1974) 39 Cal.App.3d 241, 245 [114 Cal.Rptr. 51].) "[W]illful misconduct implies the intentional doing of something either with knowledge, express or implied, that serious injury is a probable, as distinguished from a possible, result, or the intentional doing of an act with a wanton and reckless disregard of its consequences." (*Williams* v. *Carr* (1968) 68 Cal.2d 579, 584 [68 Cal.Rptr. 305, 440 P.2d 505]; see also *Goncalves* v. *Los Banos Mining Co.* (1962) 58 Cal.2d 916, 918 [26 Cal.Rptr. 769, 376 P.2d 833]; *Bastian* v. *County of San Luis Obispo* (1988) 199 Cal.App.3d 520, 533 [245 Cal.Rptr. 78]; Prosser & Keeton on Torts (5th ed. 1984) § 34, pp. 212-214.) Willful misconduct, like negligence, is subject to the rule of comparative fault. (*Southern Pac. Transportation Co.* v. *State of California* (1981) 115 Cal.App.3d 116, 121 [171 Cal.Rptr. 187]; *Sorensen* v. *Allred* (1980) 112 Cal.App.3d 717, 725 [169 Cal.Rptr. 441, 10 A.L.R.4th 937].)

Justice Traynor, writing for a majority of this court, has explained that "[n]egligence is an unintentional tort, a failure to exercise the degree of care in a given situation that a reasonable [person] under similar circumstances would exercise to protect others from harm." (*Donnelly* v. *Southern Pacific Co.* (1941) 18 Cal.2d 863, 869 [118 P.2d 465].) "A negligent person," in other words, "has no desire to cause the harm that results from his [or her] carelessness . . . ." (*Ibid.*) By contrast, an act performed with an intent to cause harm is termed "willful." "Willfulness and negligence are contradictory terms. . . . If conduct is negligent, it is not willful; if it is willful, it is not negligent." (*Ibid.*, citations omitted; accord, *Lambreton* v. *Industrial Acc. Com.* (1956) 46 Cal.2d 498, 503 [297 P.2d 9]; *Tognazzini* v. *Freeman* (1912) 18 Cal.App. 468, 473-474 [123 P. 540]; see also *Arvin- Kern Co.* v. *B. J. Service, Inc.* (1960) 178 Cal.App.2d 783, 792 [3 Cal.Rptr. 238].)

---

[1]The existing tort of nuisance is also available for cases, like this one, in which the improper handling of toxic wastes has contaminated a property owner's source of drinking water. (See *Carter* v. *Chotiner* (1930) 210 Cal. 288, 291 [291 P. 577]; Rest.2d Torts, § 832.) This court has previously remarked, in the context of a nuisance action, that emotional distress occasioned by fear of disease resulting from drinking contaminated water is compensable "at least where . . . the tortious acts are wilful." (*Acadia, California, Ltd.* v. *Herbert* (1960) 54 Cal.2d 328, 338 [5 Cal.Rptr. 686, 353 P.2d 294]; see also, Rest.2d Torts, §§ 822, 825.) But the tort of nuisance is not broad enough to encompass many other situations in which one person's wrongful handling of toxic materials has threatened the health of another.

Between these two clearly distinguishable forms of behavior—negligence and willfulness—we find what is now generally known as willful misconduct. Justice Traynor described the tort this way: "A tort having some of the characteristics of both negligence and willfulness occurs when a person with no intent to cause harm intentionally performs an act so unreasonable and dangerous that he [or she] knows, or should know, it is highly probable that harm will result. . . . Such a tort has been labeled 'willful negligence,' 'wanton and willful negligence,' 'wanton and willful misconduct,' and even 'gross negligence.' It is most accurately designated as wanton and reckless misconduct. It involves no intention . . . to do harm, and it differs from negligence in that it does involve an intention to perform an act that the actor knows, or should know, will very probably cause harm." (*Donnelly* v. *Southern Pacific Co., supra*, 18 Cal.2d 863, 869, citations omitted.)[2]

This description of willful misconduct corresponds closely to the majority's description of behavior for which fear-of-cancer damages are recoverable absent both physical injury and a probability that cancer will result. The majority explains that "fear of cancer damages may be recovered without demonstrating that cancer is probable where it is shown that the defendant is guilty of 'despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others.' (Civ. Code, § 3294, subd. (c)(1) [defining one type of 'malice'].) 'A person acts with conscious disregard of the rights or safety of others when [he] [she] is aware of the probable dangerous consequences of [his] [her] conduct and willfully and deliberately fails to avoid those consequences.' (BAJI No. 14.71 (1992 rev.) (7th ed. pocket pt.) [defining 'malice'].)" (Maj. opn., *ante*, p. 998; see also, *Taylor* v. *Superior Court* (1979) 24 Cal.3d 890, 895-896 [157 Cal.Rptr. 693, 598 P.2d 854].)[3]

Thus, the tort of willful misconduct seems to me an appropriate home for the liability that the court today recognizes for malicious contamination of a substance or substances likely to be consumed by others. Certainly, the tort

---

[2]Although this court has said that negligence and willful misconduct are "mutually exclusive" (*Lynch* v. *Birdwell* (1955) 44 Cal.2d 839, 848 [285 P.2d 919]), nevertheless it is not a defense to a charge of negligence "that the conduct was willful or the harm intended." (*American Employer's Ins. Co.* v. *Smith* (1980) 105 Cal.App.3d 94, 101 [163 Cal.Rptr. 649].)

[3]The element of "probable dangerous consequences" referred to in the BAJI instruction quoted by the majority corresponds to that part of the test for willful misconduct requiring that serious injury be a "probable, as distinguished from a possible, result" (*Williams* v. *Carr, supra*, 68 Cal.2d 579, 584). To construe this language as requiring proof that *the occurrence of cancer* is more likely than not would result in a scope of liability no greater than that for simple negligence. Accordingly, the probable harm requirement is properly understood as referring to the risk that the defendant's conduct will cause persons such as the plaintiffs to ingest toxic chemicals and as a result experience reasonable, genuine, and serious fear of cancer.

of willful misconduct would be a more appropriate home than the tort of negligence. But there is another possibility worthy of mention.

The existence of a substantial body of legislation designed to protect the public from exposure to toxic substances could provide a basis for liability. As section 874A of the Restatement Second of Torts explains: "When a legislative provision protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, the court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision, accord to an injured member of the class a right of action, using a suitable existing tort action or a new cause of action analogous to an existing tort action." Applying this principle, courts may use a legislative prohibition as the basis for recognizing a new intentional tort, or for expanding the scope of an existing intentional tort to cover the prohibited conduct. (See *Smith* v. *Superior Court* (1984) 151 Cal.App.3d 491, 497-500 [262 Cal.Rptr. 754] [intentional spoliation of evidence]; *Middlesex Ins. Co.* v. *Mann* (1981) 124 Cal.App.3d 558, 570 [177 Cal.Rptr. 495] [violation of fiduciary duty]; *Czap* v. *Credit Bureau of Santa Clara Valley* (1970) 7 Cal.App.3d 1, 6 [86 Cal.Rptr. 417] [unfair collection practice]; *Laczko* v. *Jules Meyers, Inc.* (1969) 276 Cal.App.2d 293, 295 [80 Cal.Rptr. 798] [tampering with vehicle odometer].) Here, defendant's flagrant and willful violation of environmental laws and regulations designed to protect public health could provide the impetus for recognition of a new tort of malicious toxic contamination. The increasing incidence of such behavior, an unfortunate byproduct of our society's dependence on toxic chemicals, warrants the specific public and legal attention that a new tort category would provide.

Recognition of a new tort would be consistent also with section 870 of the Restatement Second of Torts, which provides: "One who intentionally causes injury to another is subject to liability to the other for that injury, if his [or her] conduct is generally culpable and not justifiable under the circumstances. This liability may be imposed although the actor's conduct does not come within a traditional category of tort liability." The liability contemplated by this section is not confined to defendants who have acted for the very purpose of inflicting harm. Rather, a defendant is understood to "intend" a harm if the defendant knows or believes that the harm is certain, or substantially certain, to result from the defendant's act. (Rest.2d Torts, § 870, com. b, p. 280.) Thus, it would be consistent with this section to recognize a new category of intentional tort liability for cases such as this one in which the defendant must have known that its improper and unlawful handling of toxic wastes would result in contamination of groundwater and eventually pose a significant threat to the health of those who, like plaintiffs, relied upon the groundwater for their domestic water needs.

Either of these alternative approaches would be preferable to creating, as the majority has done, a new subcategory within the tort of negligence for malicious toxic contamination that results in genuine, serious, and reasonable fear of cancer. The majority properly recognizes and applies the principle that greater moral fault justifies increased liability for resulting harm (see generally, Bauer, *The Degree of Moral Fault as Affecting Defendant's Liability* (1933) 81 U.Pa.L.Rev. 586), but it unaccountably fails to recognize that liability premised on proof of malice is not liability for negligence.

**GEORGE, J.,** Concurring and Dissenting.—I concur in the majority's conclusion that plaintiffs may recover from Firestone for the emotional distress they have suffered as a result of their fear of developing cancer because of Firestone's egregious misconduct in the disposal of its toxic waste. I dissent, however, from the majority opinion insofar as it holds that plaintiffs would not be entitled to recover for their emotional distress had defendant simply been negligent in contaminating plaintiffs' water supply.

As I shall explain, I believe the majority opinion has departed from well-established tort principles—long recognized in California—in holding that, when a defendant negligently contaminates another person's water supply, subjecting that person to the risk of personal injury or illness, the victim of this contamination may recover for the emotional distress reasonably suffered by the fear of incurring such injury or illness *only if the victim can establish that he or she is "more likely than not" to develop the injury or illness.*

As the majority opinion recognizes, a reasonable person who has consumed, cooked with, and bathed in water that has been contaminated by toxic waste is likely to sustain serious emotional distress relating to the fear of developing a serious illness in the future, not only when the person's chance of developing an illness is more than 50 percent, but also when his or her chance of developing the illness is considerably lower, for example, "only" 25 or 30 percent. In denying recovery to such a victim, despite the circumstance that—because of the risk of personal harm engendered by the defendant's negligent conduct—a person of ordinary sensibilities in the victim's position reasonably would suffer serious emotional distress, the majority opinion eliminates an important legal protection to which all persons, including victims of toxic waste exposure, long have been entitled.

In explaining its rationale for establishing a novel, high threshold—"more likely than not"—for recovery for emotional distress in this setting, the majority opinion suggests that, in the case of "toxic torts," a variety of "public policy" reasons support its departure from generally governing legal

principles. Distilled to its essence, however, the majority's position amounts to a determination that, when a defendant's wrongful conduct has the potential to cause serious physical and emotional harm *to a large number of persons*, such conduct should be afforded a greater shield from liability than conduct possessing the potential to harm only a more limited number of persons. In my view, the controlling public policy formulated in this area— for example, the stringent legislative controls governing the discarding of toxic waste—does not support the majority's approach. Indeed, it appears distressingly ironic and inconsistent with legislatively prescribed public policy to accord the individual victim of a so-called "toxic tort" *less protection* than would be accorded the victim of a more traditional course of negligent conduct.

In past decisions, this court has taken into account the danger that potentially disproportionate liability might be imposed when the issue presented was whether, and under what circumstances, a defendant who negligently injured one person should be held liable for the emotional distress suffered by *other persons* by reason of their concern over the condition of the injured person. The majority opinion in the present case, however, is the first to invoke such a rationale to limit recovery by persons who, as result of a defendant's negligence, have been made to suffer the risk of *personal* physical injury or illness and who, as a consequence, reasonably have incurred emotional distress arising out of concern for their *own* health and safety. I believe there is no justification for limiting the recovery to which this class of persons is entitled, simply because the defendant's wrongful conduct has endangered the personal safety of a large number of invididuals.

Finally, the majority's determination to embrace this novel, restrictive approach is all the more difficult to understand in that the majority's formulation is at odds with most of the decisions from other jurisdictions that have addressed this very issue in the arena of toxic torts and fear of cancer. As discussed below, numerous federal and sister-state decisions demonstrate that the policy reasons offered by the majority in support of its "more likely than not" threshold standard appropriately may be invoked when a plaintiff seeks compensation for what, in contrast, are essentially *future damages* (e.g., future medical expenses, loss of earnings, diminished life expectancy), for an illness or disease that may (or may not) develop in the future. As these out-of-state decisions explain, however, considerations such as those invoked by the majority do *not* justify the adoption of a stringent standard when a plaintiff simply seeks to recover *present damages* for the serious emotional distress that he or she *already* has suffered, reasonably and foreseeably, because of the substantial risk to the plaintiff's health posed by the defendant's negligence.

In sum, in my view no sound basis exists for the majority's adoption of a completely novel approach narrowly limiting the circumstances under which a person—whose water supply has been contaminated as a result of a defendant's negligent disposal of toxic waste—may recover for the serious emotional distress that he or she reasonably has suffered.

I

Well over half a century ago, this court recognized a plaintiff's right to recover damages for fright, shock, and nervous distress when the negligent conduct of a defendant places the plaintiff *personally* at risk, causing the plaintiff reasonably to fear for his or her own safety, *even in the absence of any injurious impact.* (See, e.g., *Webb* v. *Francis J. Lewald Coal Co.* (1931) 214 Cal. 182 [4 P.2d 532, 77 A.L.R. 675]; *Lindley* v. *Knowlton* (1918) 179 Cal. 298 [176 P. 440]; *Vanoni* v. *Western Airlines* (1967) 247 Cal.App.2d 793 [56 Cal.Rptr. 115]; see also *Dillon* v. *Legg* (1968) 68 Cal.2d 728, 738, fn. 4 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316] [citing "California's rule that plaintiff's fear for his own safety is compensable"].)

Thus, for example, if an automobile driver negligently speeds by a pedestrian in a crosswalk, narrowly missing the pedestrian but causing him or her reasonably to suffer serious emotional distress as a result of the encounter, the pedestrian is entitled to recover damages for reasonable emotional distress, even though the driver's conduct, while posing a risk of personal harm to the pedestrian, did not in fact inflict any direct physical injury. As this example illustrates, under traditional negligence principles a plaintiff's right to recover damages for emotional distress sustained as a result of fear or concern for his or her own health and safety does not depend upon whether the plaintiff *actually* incurred a physical injury (or disease) as a result of the defendant's conduct. Rather, so long as the defendant has breached a duty of care owed to the plaintiff, thereby subjecting the plaintiff to an unreasonable risk of personal injury or illness, and the defendant's conduct is of such a nature that a reasonable person, in the plaintiff's position, would sustain serious emotional distress as a result of such conduct, the plaintiff who in fact sustains such emotional distress generally is entitled to recover damages for that distress.[1]

In the present case, Firestone's wrongful dumping of toxic substances resulted in the contamination of plaintiffs' property and well water, and led

[1]In *Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518], this court concluded that, in some circumstances, a plaintiff may recover for emotional distress, unaccompanied by any physical manifestation of injury, even when the defendant's negligent conduct does not subject the plaintiff to a risk of physical injury or disease but instead subjects the plaintiff, as a "direct victim," to the risk of serious emotional distress. In the present case, of course, defendant's conduct subjected plaintiffs to the risk of physical injury or illness, and thus it is clear under the cases cited above—decided

directly to plaintiffs' involuntary and unknowing ingestion of carcinogens (including benzene and vinyl chloride, substances known to cause chromosomal damage and to have deleterious effects upon the central nervous amd immune systems) over a prolonged period of time, in amounts greatly exceeding levels deemed acceptable by the federal Environmental Protection Agency. Indisputably, therefore, Firestone's conduct subjected plaintiffs directly to a foreseeable risk of personal harm—the risk of developing cancer or some other disease as the result of the ingestion of such substances. Because they were subjected by Firestone's conduct to this risk of personal harm, plaintiffs incurred serious emotional distress arising out of concern for their own health and safety.

Under these circumstances, the general tort principle set forth above—authorizing recovery for emotional distress when a plaintiff is personally endangered by a defendant's negligent conduct and suffers serious emotional distress out of fear for his or her own safety—directly supports plaintiffs' right to recover damages for the serious emotional distress they reasonably sustained, emanating from concern for their own health.

Furthermore, past decisions of this court—applying general principles from the law of nuisance and trespass—similarly have held that, when a defendant tortiously interferes with the water supply to another person's property, the person whose water supply has been impaired is entitled to recover for emotional distress resulting from the tortious conduct, without regard to whether he or she has sustained any actual physical injury. As this court explicitly declared in *Acadia, California, Ltd.* v. *Herbert* (1960) 54 Cal.2d 328, 337 [5 Cal.Rptr. 686, 353 P.2d 294], a case involving the wrongful interference with another person's water supply: "It is settled that, *regardless of whether the occupant of land has sustained physical injury*, he may recover damages for the discomfort and annoyance of himself and the members of his family and *for mental suffering occasioned by fear for the safety of himself and his family when such* discomfort or *suffering has been proximately caused by a trespass or nuisance*." (Italics added; see *Kornoff* v. *Kingsburg Cotton Oil Co.* (1955) 45 Cal.2d 265, 272 [288 P.2d 507] [plaintiffs' suffering caused by fear for their safety was a natural consequence of defendant's invasion of their property and therefore was a recoverable item of damages]; *Herzog* v. *Grosso* (1953) 41 Cal.2d 219, 225-226 [259 P.2d 429].)

long before *Molien*—that these plaintiffs fall within the class of persons who traditionally have been permitted to maintain a tort cause of action for emotional distress. *Molien* further establishes that a plaintiff who has suffered serious emotional distress, as a result of the defendant's breach of duty to him or her, is entitled to recover for such distress even when the distress itself has not resulted in any physical manifestation of injury.

In light of these well-established principles of tort law, I believe the trial court properly concluded that, because a reasonable person in plaintiffs' position likely would sustain serious emotional distress arising from concern over the risk that defendant's conduct posed to the person's own health, plaintiffs were entitled to recover damages for the emotional distress they in fact suffered.

## II

The majority acknowledges that Firestone, in negligently disposing of its toxic waste at a facility from which such waste was banned, breached the duty of care it owed to plaintiffs, who resided on property in the vicinity of the site of the waste disposal. And the majority also acknowledges that a reasonable person whose water supply has been contaminated by toxic waste is likely to suffer serious emotional distress arising out of fear for his or her own health, even though there is considerably less than a 50 percent likelihood that the toxic waste to which the victim was exposed will in fact cause him or her to contract cancer or some other serious disease. Nonetheless, the majority deliberately limits the class of persons who can recover for the serious emotional distress they have suffered to the very small class of persons who can prove it is "more likely than not" that they will contract such a disease as a result of the defendant's conduct, denying recovery to the much greater number of persons who have sustained serious emotional distress but who have "only," for example, a 25 or 30 percent chance of contracting the disease.

As noted earlier, the majority cites a variety of "public policy" considerations in support of its "more likely than not" standard, arguing that a less stringent standard will result in a potentially unrestricted plaintiff class at a "tremendous societal cost" that, in turn, will (1) limit the availability and affordability of liability insurance for toxic liability risks, and (2) impede access to prescription drugs because of a possible proliferation of "fear of cancer" claims by the users of such medications. But these reasons amount to no more than an asserted need to restrict the potential "unlimited" liability that otherwise might burden a "toxic tort" defendant, because of the number of persons who may be adversely affected by the improper handling of toxic waste. Thus, the essence of the policy reasons invoked by the majority is a fear that, in toxic tort cases, negligent defendants may have endangered so many persons that permitting recovery under ordinary negligence standards may impose an onerous risk of liability upon these defendants. Under well-established negligence principles, however, a defendant's liability for a particular category of negligent conduct does not *contract* as the number of persons injured *increases*. In my view, it is unfair to plaintiffs in the present

case to impose upon them a threshold standard for recovery that is much more stringent than would apply had Firestone's negligent conduct had the potential to contaminate the well water of only a single property owner.

Past decisions limiting the class of persons who may recover damages for emotional distress generally have involved claimants who have suffered by reason of an injury caused *to another person.* (See, e.g., *Thing* v. *La Chusa* (1989) 48 Cal.3d 644, 661-668 [257 Cal.Rptr. 865, 771 P.2d 814]; *Elden* v. *Sheldon* (1988) 46 Cal.3d 267, 277 [250 Cal.Rptr. 254, 758 P.2d 582].) In these cases, the courts found it appropriate to establish definite limitations upon the potential class of plaintiffs, recognizing that imposing liability upon a negligent defendant who injures a person, for the emotional distress suffered by *other* persons as a result of that single injury, frequently will magnify liability well out of proportion to culpability.

These concerns are inapplicable in the present case, however, where the potential class of plaintiffs is limited to those persons who directly and personally were placed at risk by Firestone's negligent course of conduct. In other situations in which a defendant's negligence has injured or placed at risk a large number of persons (for example in an airplane crash or in other "mass tort" settings), we have not limited recovery for damages for emotional distress that reasonably has been suffered by those persons.

Indeed, in cases in which a plaintiff seeks to recover for emotional distress relating to fear for his or her *own* safety, there is no need to create a novel, artificial barrier in order to avoid an unwarranted expansion of emotional distress claims—as the majority opinion does in adopting its "more likely than not" standard—because reasonable restraints upon such claims already are subsumed under negligence principles generally applicable in this area of the law. As previously explained, to be entitled to recover such damages in these circumstances, a plaintiff must demonstrate not merely that he or she suffered some degree of emotional distress, but rather that the distress rose to the level of *serious* emotional distress. (*Molien* v. *Kaiser Foundation Hospitals, supra,* 27 Cal.3d at pp. 928-930; *Burgess* v. *Superior Court* (1992) 2 Cal.4th 1064, 1073, fn. 6 [9 Cal.Rptr.2d 615, 831 P.2d 1197].) Additionally, to justify recovery, a plaintiff must establish not only that he or she suffered this high level of emotional distress, but also that the circumstances are such that a reasonable person, in the plaintiff's position, would be likely to suffer that degree of distress, i.e., that the circumstances are such that " 'a reasonable [person], normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case.' [Citation.]." (*Molien, supra,* 27 Cal.3d at p. 928.) Finally, the plaintiff must demonstrate that the circumstances that generated the serious emotional distress were proximately caused by the defendant's negligent conduct.

In my view, in applying these generally applicable principles in the context of toxic exposure, an appropriate threshold standard would require that, in order to be entitled to recover for emotional distress, a plaintiff establish not only that he or she in fact sustained serious emotional distress, but also that (1) the level of toxic substances to which he or she was exposed posed *a significant risk* that the plaintiff will develop the feared disease or illness (i.e., a risk that is sufficiently substantial that it would result in serious emotional distress in a reasonable, rather than an unusually sensitive, person), and (2) the defendant's negligence *substantially increased* plaintiff's risk of contracting the disease or illness (so that the plaintiff's serious emotional distress is a condition for which the defendant appropriately should be held responsible.)

I note that we have affirmed the reliability of the "substantial" factor test as a means of establishing and delimiting liability in other contexts of tort law. For example, in *Mitchell* v. *Gonzales* (1991) 54 Cal.3d 1041, 1052 [1 Cal.Rptr.2d 913, 819 P.2d 872], in approving BAJI No. 3.76, employing the "substantial factor" test of causation in fact, we observed: "[T]he 'substantial factor' test," developed by the Restatement Second of Torts, section 431, and incorporated in BAJI No. 3.76, "has been comparatively free of criticism and has even received praise. 'As an instruction submitting the question of causation in fact to the jury in intelligible form, it appears impossible to improve on the Restatement's "substantial factor [test.]"' [Citation.] It is 'sufficiently intelligible to any layman to furnish an adequate guide to the jury, and it is neither possible nor desirable to reduce it to lower terms.'"

In sum, because the generally applicable tort principles have been fashioned so as to avoid imposition of unlimited or undue liability for emotional distress claims made by persons who physically have been endangered by a defendant's negligent conduct, there is, in my opinion, no justification for the majority opinion's holding saddling direct victims of toxic exposure with an additional and onerous "more likely than not" standard, a threshold that, as a practical matter, is likely to constitute a barrier barring recovery for even the most extreme and reasonably sustained emotional distress, in virtually all cases in which a disease possessing a lengthy latency period has not yet manifested itself.

### III

In adopting a "more likely than not" standard as a severe limitation upon the right of toxic-tort victims to obtain compensation for the emotional distress they reasonably and foreseeably suffer as a result of concern for their health and safety, the majority opinion declines to follow a substantial

body of decisions from other jurisdictions that have addressed this very issue.

Numerous federal and out-of-state authorities recognize that the tort of negligent exposure to toxic substances gives rise to two completely distinct types of claims for compensatory damages: (1) one involving the increased risk of developing a disease in the future, and (2) the other, typified in the case before us, involving the *present* injury of emotional distress, engendered by the claimant's knowledge that he or she has ingested a harmful substance (referred to as a claim premised upon "fear of cancer"). The United States Sixth Circuit Court of Appeals recently stated: "A real distinction can be drawn between the possibility of recovery for increased risk of cancer and that for increased fear of cancer . . . . [Fear of cancer] is a claimed present injury consisting of mental anxiety and distress over contracting cancer in the future, as opposed to increased risk of cancer, which is a potential physical predisposition of developing cancer in the future." (*Cantrell* v. *GAF Corp.* (6th Cir. 1993) 999 F.2d. 1007, 1012.)

Almost without exception, courts have required, as a prerequisite to recovery on an "increased risk" claim, that the plaintiff establish "to a reasonable medical certainty"—or that it is "more likely than not"—that the plaintiff actually will develop the disease in the future. (See, e.g., *Abuan* v. *General Electric Co.* (9th Cir. 1993) 3 F.3d 329, 334; *Sterling* v. *Velsicol Chemical Corp.* (6th Cir. 1988) 855 F.2d 1188, 1204-1206; *Dartez* v. *Fibreboard Corp.* (5th Cir. 1985) 765 F.2d 456, 466.)

With respect to a claim for emotional distress involving fear of cancer, however, the majority of jurisdictions and legal commentators recognize that a "more likely than not" threshold standard is *not* applicable; rather, a plaintiff's likelihood of actually developing the feared disease simply is one relevant factor in assessing the reasonableness of his or her claim. (See *Cantrell* v. *GAF Corp.*, *supra*, 999 F.2d at p. 1012; *Sterling* v. *Velsicol Chemical Corp.*, *supra*, 855 F.2d 1188; *Dartez* v. *Fibreboard Corp.*, *supra*, 765 F.2d at p. 468; *Hagerty* v. *L & L Marine Services, Inc.* (5th Cir. 1986) 788 F.2d 315, 318, mod. on denial of rehg. en banc, (1986) 797 F.2d 256; *Merry* v. *Westinghouse Electric Corp.* (M.D. Pa. 1988) 684 F.Supp. 847, 852; *Lavelle* v. *Owens-Corning Fiberglas Corp.* (1987) 30 Ohio Misc.2d 11 [507 N.E.2d 476]; see also *In re Moorenovich* (D.Me. 1986) 634 F.Supp. 634.)

This now well-accepted principle was stated in *Sterling* v. *Velsicol Chemical Corp.*, *supra*, 855 F.2d at page 1206, as follows: "While there must be a reasonable connection between the injured plaintiff's mental anguish and the

prediction of a future disease, the central focus of a court's inquiry in such a case *is not on the underlying odds that the future disease will in fact materialize. To this extent, mental anguish resulting from the chance that an existing injury will lead to the materialization of a future disease may be an element of recovery even though the underlying future prospect for susceptibility to a future disease is not, in and of itself, compensable inasmusch as it is not sufficiently likely to occur.*" (Italics added.)

Following an extensive review of decisions in other jurisdictions, the authors Schwartzbauer and Shindell, in *Cancer and the Adjudicative Process: The Interface of Environmental Protection and Toxic Tort Law* (1988) 14 Am.J.L. & Med. 1, conclude at page 43: "If the anxiety is both genuine and non-trivial, a plaintiff ought not be denied a recovery merely because the chance that the future consequence will develop is forty-nine percent rather than fifty-one percent. *The 'more-likely-than not' test is used to determine whether to compensate for the future consequence itself; not for the present fear of such a future consequence.*" (Italics added.)

## IV

The majority's creation of a novel, unrealistically high threshold standard for recovery for serious emotional distress, reasonably and foreseeably suffered by plaintiffs as the result of Firestone's negligent contamination of their well water, constitutes an unwarranted deviation from tort principles well established under the decisional law of California and other jurisdictions. In my view, this deviation is directly contrary to, rather than in furtherance of, established public policy in the area of toxic exposure.

Accordingly, I would affirm the trial court's award of emotional distress damages in favor of plaintiffs.